Argued and submitted July 15, 2014, reversed and remanded June 3, petitions for review allowed October 22, 2015 (358 Or 145)

Patricia PIAZZA,
acting on behalf of Farley Piazza and Associates
and as Personal Representative of the Estate of
Martha Paz de Noboa Delgado, Deceased,
*Plaintiff-Appellant,*

*v.*

Bryan KELLIM,
dba 99 Pawn & Guns,
*Defendant,*

*and*

FIVE STARS, INC.,
dba The Zone;
Concept Real Estate, LLC;
Concept Entertainment Group, LTD.;
Rotary International and
Rotary International District 5100,
*Defendants-Respondents.*

Multnomah County Circuit Court
120100270; A153286

354 P3d 698

J. Randolph Pickett argued the cause for appellant. With him on the briefs were R. Brendan Dummigan, Kimberly O. Weingart, and Pickett Dummigan LLP; Benjamin B. Grandy and Benjamin B. Grandy, P.C.

Jonathan Henderson argued the cause for respondents Rotary International and Rotary International District 5100. With him on the brief were William Davis and Davis Rothwell Earle & Xochihua, P.C.

James L. Hiller argued the cause for respondents Five Stars, Inc., dba The Zone, Concept Real Estate, LLC, and Concept Entertainment Group, LTD. With him on the brief was Hitt Hiller Monfils Williams LLP.

Before Lagesen, Presiding Judge, and Tookey, Judge, and Edmonds, Senior Judge.

LAGESEN, P. J.

Edmonds, S. J., dissenting.

**LAGESEN, J.**

This case requires us to again address the issue of how to determine when criminal conduct by a third party is foreseeable to another for purposes of Oregon negligence law. In particular, it requires us to consider whether the plaintiff in this case alleged sufficient facts in his complaint to withstand a motion to dismiss under ORCP 21 A(8) that was predicated on the theory that plaintiff had not adequately pleaded the foreseeability element of her negligence claims against defendants. Plaintiff's decedent was a foreign exchange student who was fatally shot outside an underage nightclub while she and other exchange students were waiting in line to enter the club. Plaintiff subsequently brought negligence claims against the owners and operators of the nightclub and the Rotary organizations that ran the foreign exchange program, alleging that each of those defendants knew of prior instances of violence around the nightclub and failed to take reasonable precautions to avoid the harm that befell the decedent. The defendants moved to dismiss the complaint, on the ground that this particular act of violence—an assault by a mentally ill person who went to the nightclub looking to shoot "preppies" or "pop tweens"—was unforeseeable as a matter of law. The trial court agreed with defendants, ruling that the assault was "a random shooting by a mentally disturbed individual" and that "[n]either the Rotary defendants nor the club defendants could reasonably anticipate the actions of [this particular shooter] or of homicidal mentally ill individuals in general." Because we conclude that the complaint sufficiently alleged the foreseeability element of plaintiff's claims so as to withstand an ORCP 21 A(8) motion, thereby permitting the case to proceed from the pleading stage to the evidentiary stages,[1] we reverse the judgment and remand for further proceedings.

## I. BACKGROUND

A. *Plaintiff's Allegations*

Plaintiff is the personal representative of the Estate of Martha Paz de Noboa Delgado (Delgado). Her complaint alleges the following.

---

[1] By "evidentiary stages" we mean summary judgment or trial depending on the parties' litigation choices and the outcome of any summary judgment practice.

## 1. *Factual allegations*

Delgado, a 17-year-old Peruvian resident, was staying with a host family in White Salmon, Washington, as part of an international exchange program run by defendants Rotary International and Rotary International District 5100 ("the Rotary defendants"). On the evening of January 24, 2009, a group of approximately 14 Rotary exchange students, including Delgado, gathered at the home of the host parents of one of the students for a birthday celebration. Later in the evening, the host parents drove the group to a Portland nightclub, The Zone. The host parents dropped the students off near The Zone without a chaperone and planned to pick them up at 1:00 a.m.

The Zone, which is owned and operated by a family of entities ("the Zone defendants"[2]), was an underage nightclub that admitted people ages 16 to 21 and featured dancing. The Zone frequently had a "cordoned-off line of customers on the sidewalk outside the club waiting to get in." Delgado and the other exchange students were waiting on the sidewalk to get into The Zone when an assailant, Erik Ayala, shot Delgado twice. Delgado died as a result of her injuries. Ayala, who had previously been diagnosed with schizophrenia and had exhibited obvious signs of mental illness and depression to coworkers, "went to [T]he Zone nightclub looking to shoot 'preppies' or 'pop tweens,' against whom he may have held a grudge." Before shooting Delgado, Ayala had stood in front of The Zone and loaded his pistol.

The 2009 shooting was not the first at that particular location. In July 2002, a shooter fired into a crowd of people standing outside the nightclub, striking three people. At that time, the club was named "Quest PDX," but it was owned and operated by the Zone defendants. There had also been a "history of fights and assaults in the line outside the nightclub."

Moreover, The Zone's surrounding area had experienced violent crimes before the 2009 shooting. The Zone

---

[2] These include defendants Five Stars, Inc.; Concept Entertainment Group, Ltd.; and Concept Real Estate, LLC. For purposes of this opinion, we refer to the defendants collectively.

was located in the "Old Town/Chinatown neighborhood" bordering downtown Portland; it was also part of what is referred to by police as the "downtown entertainment district," which includes several streets in downtown Portland where nightclubs and bars are located. In the years leading up to the 2009 shooting, the downtown entertainment district was "plagued by recurrent incidents of violence," which were "linked by police to gang activity and to clubs in the district exceeding capacity and serving too much alcohol." In 2005, a string of downtown shootings left two people dead and four injured, and police "blanketed the downtown entertainment district with police officers to ease fear." The effort, which was called "Operation Safe Streets," included at least two dozen police officers patrolling on foot and horseback on Friday and Saturday nights through early morning, gang enforcement officers, traffic safety officers, parole officers, and liquor control investigators. Owners of downtown nightclubs were asked to close early on weekend nights and were advised to have adequate security, cut off all intoxicated customers, and respond swiftly to problems or notify police.

After violence continued in the downtown entertainment district, Portland police called a "bar summit" in August 2006 with owners and managers of downtown bars and nightclubs to help them adopt policies to reduce violence. At the meeting, which included a representative of one of the Zone defendants, businesses and police addressed, among other issues, the shootings in the Old Town/Chinatown neighborhood. "It was known by Portland police and club owners alike that there was a high probability that more shootings would take place in the downtown entertainment district."

At the summit, police and businesses also addressed whether the violence on downtown sidewalks and parking lots was related to drunken club-goers (as police believed) or drug dealers (as clubs contended). The Zone was located in what used to be one of Portland's "Drug Free Zones," in which anyone convicted of a drug offense could be barred from returning. The drug-free-zone program expired in 2007, and "drug dealers and addicts took over Portland's Chinatown/Old Town neighborhood"; "[p]olice officers came

to refer to the area as 'crack alley' and residents complained of being terrorized by an increasingly aggressive and confrontational breed of drug users and sellers." By January 2009, the Old Town/Chinatown neighborhood "had approximately fourteen agencies serving addicted, mentally ill, and homeless people, more than any other neighborhood in the city, with thousands of clients coming to the area every day. Many of those clients bought drugs."

"Drug dealers, drug users, and gang members, all of whom frequented the area where the Zone nightclub was located, frequently carried weapons * * *." "[S]ome club owners, realizing that their clients were in danger of violent assault, increased security at their bars and nightclubs." In 2006, Dan Lenzen, a principal at one of the Zone defendants, "acknowledged downtown safety problems, but said they were created by 'a few bad apples,'" and that police, liquor control, and others should "work together for the benefit of club-goers."

Before the shooting, The Zone had undertaken measures to provide security for their customers inside and outside their club. Those measures included:

"(a)  The Zone had an employee whose primary responsibility was monitoring customers as they come and go from the club. The employee was to assist in line control; to distance 'undesirables,' *i.e.*, intoxicated persons, harassers, transients, known trouble makers, or gang affiliated persons from guests; and to monitor the parking lot and deter potential guests from loitering in or around their cars;

"(b)  The Zone nightclub had a security camera that monitored the outside of their establishment;

"(c)  The Zone nightclub had a security guard or door-person at the door outside of the premises who frisked everyone before entry, checking for drugs, alcohol, firearms, or other weapons;

"(d)  In the past, The Zone had hired off-duty police officers to provide security for their customers;

"(e)  On or about 2006, The Zone nightclub remodeled its facilities in the hopes of attracting a better clientele and reducing problems at the club including violence."

Thus, plaintiff alleged, the Zone defendants "knew about the risk of violence that its customers faced."

Plaintiff further alleged that underage nightclubs, generally, are understood to pose "inherent" risks of violence because of the high proportion of young male patrons, high noise levels, crowding, competitive environment, and underage drinking. "A metropolitan nightclub may see as many as three or four assaults on staff each night and are often confronted with armed patrons. Shootings, stabbings, felonious assaults, drug violations, and/or murders are commonplace in metropolitan nightclubs across the country." Indeed, several cities around the country "have banned or heavily regulated teen dance clubs."

According to plaintiff's allegations, the instances of violence that "occurred nationally at underage nightclubs and locally in the area around The Zone nightclub were all publicized in local and/or national media, and [the Rotary defendants] knew, or in the exercise of reasonable care, should have known, about the dangers of leaving [Delgado] at The Zone nightclub on the date and at the time in question."

### 2. *Specifications of negligence*

In plaintiff's second amended complaint, which is the operative complaint, she alleged that the Zone defendants owed a duty to Delgado, a business invitee, to exercise reasonable care to make the premises safe for her, including protection from criminal acts by third parties. Plaintiff alleged that the Zone defendants breached that duty in the following particulars:

"(a)  In failing to take reasonable measures to protect their customers from the criminal acts of third parties;

"(b)  In making their customers stand in line in front of the club;

"(c)  In failing to have sufficient security personnel to protect their customers;

"(d)  In failing to properly train their staff to identify threats to their customers;

"(e)  In failing to identify Erik Ayala as a threat while he was in front of The Zone;

"(f)  In failing to have adequate emergency response procedures in place to protect customers once a threat was identified; [and]

"(g)  In failing to warn their customers or the parents of their customers about the risk of being assaulted while patronizing The Zone nightclub."

With regard to the Rotary defendants, plaintiff alleged that Delgado lived with a host family under the "auspices, sponsorship, and control" of the Rotary defendants, and that the host parents were the Rotary defendants' agents. Plaintiff alleged that the Rotary defendants were authorized to exercise "independent supervisory and parental responsibility to safeguard [Delgado's] physical and mental well-being," and, thus, that the special relationship between Delgado and the Rotary defendants "gave rise to a heightened duty of care beyond the general duty to avoid foreseeable risk of harm." According to plaintiff, the Rotary defendants, directly or acting through their agents, breached that duty in the following particulars:

"(a)  In failing to provide host parents with sufficient training so as to reasonably ensure the safety of the students;

"(b)  In leaving the students unsupervised, late at night in a high crime area;

"(c)  In failing to adopt and enforce reasonable rules and regulations to ensure the safety of the students;

"(d)  In failing to adopt reasonable rules and regulations regarding travel to prevent the students from being left alone in dangerous areas;

"(e)  In failing to properly and adequately warn all the students and their parents of the dangers of being left unsupervised in a high crime area."

B.  *Procedural History*

The Zone defendants and Rotary defendants each moved under ORCP 21 A to dismiss all of the claims asserted in plaintiff's second amended complaint, on the ground that

plaintiff had failed to allege any foreseeable risk of harm to Delgado. *See* ORCP 21 A(8) (providing for dismissal for "failure to state ultimate facts sufficient to constitute a claim"). In their respective Rule 21 motions, defendants argued that plaintiff's negligence allegations boiled down to the following theory: (1) Criminals were more likely to commit crimes in the area in which The Zone was located; (2) defendants knew or should have known of that fact; and (3) Delgado was killed in that "high crime area." But those allegations, defendants argued, failed to establish a foreseeable risk of the *particular crime* that killed Delgado, which defendants characterized as a "random spree shooting" against a particular class of person ("preppies"). According to defendants, such a shooting was just as likely to occur at a mall, a movie theater, or an ice cream parlor; thus, "the occurrence of a random spree shooting in a high crime area does not make it any more foreseeable than if it occurred in a place one would normally deem safe, such as a movie theater or a school." Indeed, the "randomness" of shootings like the one that injured Delgado, defendants argued, "means that when and where they occur are not foreseeable, as that term is used in Oregon tort law."

Plaintiff, meanwhile, argued that defendants' arguments misapprehended what it means for a risk of harm to be foreseeable under Oregon case law. In plaintiff's view, "[f]oreseeability in this case does not turn on being able to foresee 'random spree shootings,' but rather on foreseeing the risk of a *violent criminal assault*" to Delgado. (Emphasis added.) "It is the dangerous character of the nightclub, its location and its violent history," plaintiff asserted, "that would allow a jury to conclude that the harm in this case was foreseeable." She explained that, "[t]here are many foreseeable ways in which the assault might have taken place[.] * * * Even if an assault by a mentally ill person is somehow unusual or unexpected, the resulting harm was legally foreseeable because it was within the class of reasonably foreseeable hazards" at The Zone.

The trial court ultimately agreed with defendants, ruling that the shooting that killed Delgado was unforeseeable as a matter of law. In the order granting defendants' motions, the court explained:

"For the purposes of these motions the allegations about what the defendants should have known must be accepted as true. The court assumes both the club owners and the exchange program sponsors knew of all the alleged acts of violence associated with the neighborhood, and of the problems with violence alleged to be characteristic of underage clubs. Knowing of these dangers, the defendants may be expected to take reasonable steps to avert them. They should not be required to take precautions against dangers not reasonably expected. So the question becomes one of how reasonable it is to expect attempts at mass murder.[3]

"The answer is that such crimes are both rare and random. Looking back over the years there have been similar acts of violence at a McDonald's in San Ysidro, California, a movie theater in Aurora, Colorado, a college campus in Virginia, and an army base in Texas. Each of these events, like this event, was a random shooting by a mentally disturbed individual. Other crimes, even violent crime, which happened at one of these locations prior to the shooting do not create an expectation that such shootings will occur.

"Neither Rotary defendants nor the [Zone] defendants could reasonably anticipate the actions of Mr. Ayala in particular or of homicidal mentally ill individuals in general. There may come a time in which such crimes are reasonably anticipated, but that time is not, thankfully, the present."

(Footnote omitted.)

The court subsequently entered limited judgments that dismissed all claims against both the Zone defendants and the Rotary defendants. Plaintiff appeals those limited judgments and argues, as she did below, that her complaint alleges facts that, if proved, establish a foreseeable risk of the type of harm that befell Delgado.

## II.  STANDARD OF REVIEW

In reviewing a trial court's dismissal of a complaint under ORCP 21 A(8), we assume that the facts alleged in the complaint are true and draw all reasonable inferences in plaintiff's favor. *Bailey v. Lewis Farm, Inc.*, 343 Or 276, 278,

---

[3] The court explained that, although the shooting resulted in two deaths, "the circumstances of the incident, as pled, make the characterization ['mass murder'] appropriate, even though the casualties were relatively few in number."

171 P3d 336 (2007). We then assess whether a reasonable juror could find that plaintiff had proved the disputed element of her claim—in this case, foreseeability—if the facts pleaded are ultimately proved at trial. *See, e.g., id.* at 287 ("If those facts [in the complaint] are true, then a reasonable jury could find that the failure of the axle, the loss of the wheels, and the resulting injury to plaintiff were all foreseeable."); *Moore v. Willis*, 307 Or 254, 256, 767 P2d 62 (1988) ("At issue is whether the plaintiff alleged ultimate facts that would allow a factfinder to determine that the violence was foreseeable."); *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987) ("The role of the court is what it ordinarily is in cases involving the evaluation of particular situations under broad and imprecise standards: to determine whether upon the facts alleged * * * no reasonable factfinder could decide one or more elements of liability for one or the other party."). In conducting this analysis of the sufficiency of the complaint, we adhere to the command of ORCP 12 A that "[a]ll pleadings shall be liberally construed with a view of substantial justice between the parties," and we "attribute[] to the pleading all facts which can be implied by fair and reasonable intendment from those expressly averred." *Stotts v. Johnson and Marshall*, 192 Or 403, 415, 234 P2d 1059 (1951) (interpreting the statutory predecessor to ORCP 12 A).

## III. ANALYSIS

### A. *Negligence Standards*

Under Oregon law, "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari*, 303 Or at 17. Where a party invokes a special status, relationship, or standard of conduct, "then that relationship may 'create,' 'define,' or 'limit' the defendant's 'duty' to the plaintiff." *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 341, 83 P3d 322 (2004) (quoting *Fazzolari*, 303 Or at 17). However, even in that circumstance, "when a plaintiff

alleges a special relationship as the basis for the defendant's duty, the scope of that [particular] duty may be defined or limited by common-law principles such as foreseeability." *Oregon Steel Mills, Inc.*, 336 Or at 342 (footnote omitted).

In this case, plaintiff invokes two special relationships that potentially "create," "define," or "limit" defendants' duties. *Fazzolari*, 303 Or at 17. The first, which plaintiff invokes as to the Zone defendants, is the relationship between owners of land and persons whom they invite onto their premises. Under the "business invitee rule," which is described in section 344 of the *Restatement (Second) of Torts* (1965),[4] "a business, as a possessor of premises, has a duty to take reasonable steps to protect its visitors from *reasonably foreseeable* criminal acts by third persons." *Stewart v. Kids Incorporated of Dallas, OR*, 245 Or App 267, 278, 261 P3d 1272 (2011), *rev dismissed as improvidently allowed*, 353 Or 104 (2012) (emphasis added).

The second "special relationship," which plaintiff invokes with respect to the Rotary defendants, is the relationship between a child and a person entrusted with that child's care. *See id.* (describing similar allegations that a defendant was "an organization entrusted with children for supervision and care, [and] had a duty akin to the relationship between a school and its minor students"). In *Stewart*,

---

[4] Section 344 provides that a possessor of land who holds it open for business purposes is subject to liability to members of the public while they are on the land for such a purpose, for physical harm caused by the "accidental, negligent, or intentionally harmful acts of third persons," and by the failure of the possessor to exercise reasonable care to "discover that such acts are being done or are likely to be done," or "give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it." Comment f to that section provides:

"*Duty to Police Premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. *If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.*"

(Emphasis added.)

we explained that schools "have a special duty to students 'apart from any general responsibility not unreasonably to expose people to a foreseeable risk of harm,' and that '[t]he scope of this obligation does not exclude precautions against risks of crime or torts merely because a third person inflicts the injury.'" 245 Or App at 279 (quoting *Fazzolari*, 303 Or at 19-20). At the same time, a school—or, by analogy, an organization similarly entrusted with the supervision and care of a minor—is not strictly liable for all injuries that occur during the time of that relationship. "[T]he duty to protect against risks of harm—including the risk of harm from third-party criminal acts—imposed by the special relationship is broader than that which might apply in the absence of a special relationship, [but] *that obligation does not extend to unforeseeable risks of harm.*" *Stewart*, 245 Or App at 279 (emphasis added).

Thus, the scope of each of the special relationships alleged in this case is defined in terms of reasonable foreseeability. That is, "although each defendant may have had a special relationship with plaintiff's [decedent] and a corresponding duty to protect against criminal conduct by third parties, that duty extended only to reasonably foreseeable criminal conduct." *Id.* The question, then, is what does it mean for third-party criminal conduct to be "reasonably foreseeable"? Or, more to the point, when a plaintiff's negligence claim arises from harm caused by third-party criminal conduct, what facts must the complaint allege to withstand an ORCP 21 A(8) motion on the forseeability element of the claim?

The starting point for discussing what must be alleged (and eventually proved) to establish foreseeability of harm—regardless of mechanism—is *Fazzolari*. In *Fazzolari*, a case that itself involved harm caused by third-party criminal activity, the court explained that "common-law negligence imposes liability for harms of the general kind and to plaintiffs of the general class placed at risk, harms that a reasonable factfinder, applying community standards, could consider within the range of foreseeable possibilities." 303 Or at 12-13 (citing *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 609, 469 P2d 783 (1970) (*Jefferson Plywood*)). Thus,

whether a particular harm is foreseeable turns in large part on how the class of harm is characterized in a given case. That is,

> "[i]t has been observed that 'if we use a very generalized description of the type of harm that was foreseeable and of the type of harm that occurred, an answer that the result was within the risk is inevitable.' And on the other hand, '[if] we use a detailed, mechanism-of-harm description of the result and the risks, the answer will be negative.'"

*Jefferson Plywood*, 255 Or at 610 (quoting Robert E. Keeton, *Legal Cause in the Law of Torts* 51 (1963); footnotes omitted).

Both before and after *Fazzolari*, in cases involving claims of negligence based on harm caused by third-party criminal activity, the Supreme Court and this court have struggled with how to formulate the foreseeability element of the claim and, in particular, with how to characterize the "risk of harm" that must be foreseeable. Our decision in *McPherson v. Oregon Dept. of Corrections*, 210 Or App 602, 152 P3d 918 (2007), exemplifies that struggle. In *McPherson*, on review of a grant of summary judgment, we considered whether a reasonable factfinder could find that it was foreseeable to an apartment complex that two of its tenants would be subject to violent assaults in a stand-alone laundry shed on the complex premises. The assaults were committed by an escaped convict. Before concluding that a reasonable factfinder could find that the risk of such assaults was foreseeable to the apartment complex because of the evidence of past similar crimes in and around the complex, we thoroughly canvassed the case law on foreseeability of harm caused by third-party criminal activity. *Id.* at 609-17. After conducting that analysis, we explained that we were able to

> "draw only one conclusion: whether a rational juror can find that harm is foreseeable, particularly in the context of criminal activity by third parties, is an *ad hoc* determination depending on the particular circumstances of each case. No bright line rules exist. Fact-matching is of limited utility. Unforeseeability as a matter of law should be found only in extreme cases."

*Id.* at 617.

Notwithstanding that admonition, there are common features to the decisions involving third-party criminal activity—and perhaps more consistency to our approach to the issue of foreseeability in such cases than we acknowledged in *McPherson*. First, the cases have essentially asked the same two questions concerning foreseeability that the Supreme Court asked in *Jefferson Plywood*: (1) Based on the facts that the defendant knew or should have known, what general class of criminal harm was foreseeable to the defendant?; and (2) was the criminal harm that ultimately befell the plaintiff within that general class of harm? *See, e.g., Fazzolari*, 303 Or at 21 (considering whether an assault and rape of the plaintiff, a high school student, by an unknown assailant while waiting outside her school was reasonably foreseeable, and reiterating that "the concept of foreseeability refers to generalized risks of the type of incidents and injuries that occurred rather than predictability of the actual sequence of events"); *Uihlein v. Albertson's, Inc.*, 282 Or 631, 640-41, 580 P2d 1014 (1978) (examining whether "on this record [the defendant supermarket] neither knew nor had reason to know of the likelihood of harmful acts of this kind against its patrons in general and plaintiff in particular"); *Torres v. United States Nat. Bank*, 65 Or App 207, 215, 670 P2d 230, *rev den*, 296 Or 237 (1983) (explaining that the harm to the plaintiff must be within the "general class of harm a reasonable person would anticipate might arise from defendant's conduct, and the person injured must be within the general class threatened by the conduct").

Second, a plaintiff must allege facts demonstrating that the harm by third-party criminal conduct was foreseeable to the defendant in a concrete way and may not rely on the abstract proposition that "crimes may occur and that the criminals perpetrating them may cause harm." The Supreme Court rejected that theory in *Buchler v. Oregon Corrections Div.*, 316 Or 499, 511-12, 853 P2d 798 (1993), explaining:

> "While it is generally foreseeable that criminals may commit crimes and that prisoners may escape and engage in criminal activity while at large, that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way

to the criminal opportunity. In other words, in our society it is foreseeable that crimes may occur and that the criminals perpetrating them may cause harm. Thus, in a general sense, it is foreseeable that anyone whose conduct may in any way facilitate the criminal in committing the crime has played some part in the resulting harm. But mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it."[5]

Our recent decision in *Stewart* illustrates the point made in *Buchler*. There, the plaintiff alleged that his ward, Jane Doe, had been sexually assaulted by an adult male in the men's restroom of a Dairy Queen restaurant during a fundraiser sponsored by Kids, Inc. The plaintiff alleged that the defendants, Kids, Inc. and Dairy Queen, should have reasonably foreseen the risk of that harm because "(1) the car wash was advertised; (2) teenage girls would be present at the car wash, and (3) sexual predators might have had Internet contact with the teenage girls." *Stewart*, 245 Or App at 284. The trial court ruled that the risk was unforeseeable as a matter of law and dismissed the complaint. *Id.* at 273.

In analyzing whether the plaintiff had alleged sufficient facts to demonstrate that the sexual assault was foreseeable to the defendants, we reasoned that the plaintiff's theory in *Stewart* (that the world is full of sexual predators who pose a foreseeable risk of assault) was indistinguishable from the theory discredited in *Buchler*, *i.e.*, that it is always foreseeable that criminals will steal guns and harm people with them. We further reasoned that the plaintiff's

---

[5] In so doing, the Supreme Court retreated from its reasoning in *Kimbler v. Stillwell*, 303 Or 23, 734 P2d 1344 (1987), in which the question was whether a storeowner could be held liable for "facilitating" a thief's act of breaking into the store, stealing a gun and ammunition, and taking the gun to a location where he shot the plaintiff's decedent. The court in *Kimbler*, citing *Fazzolari* and other cases, explained that, "[t]he fact that a plaintiff's injury was inflicted by the intentional, even criminal, act of a third person does not foreclose liability if such an act was a foreseeable risk facilitated by the defendant's alleged negligence." *Kimbler*, 303 Or at 27-28. The court then held that the plaintiff's allegations— that firearms known to be lightly secured in a retail store might be stolen and used against third persons—were sufficient to survive a motion to dismiss for failure to state a claim.

allegations against Dairy Queen were insufficient to give rise to a reasonable inference that the "place or character" of the restaurant was such that Dairy Queen should have anticipated the sexual assault. We explained that the plaintiff was required to allege *specific factual support*—as opposed to relying on generalized abstractions about the existence of criminal activity—that those in the family restaurant business should know that widely advertising an event with minors would attract sexual predators. *Id.* at 286 (explaining that the plaintiff's complaint had alleged "nothing more than a theoretical possibility that such a harm might occur; for example there are no allegations of fact that sexual assault occurs at these types of sites, or among gatherings of teenagers in public places, or that sexual assault is a 'hazard inherent' in this type of activity" (quoting *Torres,* 65 Or App at 214)).

A third principle that emerges from our case law in this area is that proof of foreseeability will differ depending on whether the alleged negligence by a defendant is the failure to protect against the risk of harm posed by criminals in general, such as at a school (*Fazzolari*), a bank (*Torres*), an apartment complex (*McPherson*), stores (*Uihlein* and *Brown v. J.C. Penney Co.,* 297 Or 695, 688 P2d 811 (1984)), bars (*Cunningham v. Happy Palace, Inc.,* 157 Or App 334, 970 P2d 669 (1998), *rev den,* 328 Or 365 (1999), and *Moore,* 307 Or 254), or a restaurant (*Stewart*), or whether the alleged negligence is negligent supervision or screening of *particular individuals* who might engage in criminal activity (*Buchler; Allstate Ins. Co. v. Tenant Screening Services, Inc.,* 140 Or App 41, 914 P2d 16 (1996); and *McAlpine v. Multnomah County,* 131 Or App 136, 883 P2d 869 (1994), *rev den,* 320 Or 507 (1995)).[6] As we observed in *McPherson,*

---

[6] It is possible for a case to involve both theories of negligence—*i.e.*, that a defendant should have foreseen the risk of harm from criminal activity generally and from the risks posed by a particular actor. *Cf. Chapman v. Mayfield,* 263 Or App 528, 532, 329 P3d 12, *rev allowed,* 356 Or 400 (2014) (explaining that a plaintiff can establish foreseeability of harm from an intoxicated person "by proving facts showing that a tavern owner's general observations and experiences 'in the business of serving alcohol' gave that tavern owner reason to know that violence would be a foreseeable result of serving alcohol to a visibly intoxicated person" or, alternatively, "by proving facts showing that the tavern owner knew or had reason to know that the visibly intoxicated person in question had a propensity for violence that could be incited by further drinking").

courts have occasionally defined the class of harm more narrowly when the question is whether a particular person's criminal history makes a future crime by that same person foreseeable, sometimes requiring a high degree of similarity between the actor's past crimes and the crime at issue. 210 Or App at 615 (describing the holdings in *Allstate* and *McAlpine*).

By contrast, where the case involves a theory of negligence based on the foreseeability of criminal activity at large, as this case does, courts have consistently defined the class of harm more generally. In this type of case, courts have focused on whether the defendant was on notice of the potential for harm from some class of criminal activity. *See Uihlein*, 282 Or at 641 ("[W]e do not mean to say that the storekeeper must be able to foresee the exact harm which occurs, but there must be something to alert the storekeeper to the likelihood of harm of some kind from a criminal agency."); *Cunningham*, 157 Or App at 338 (explaining that the question was "whether [the] defendant could have foreseen that [the] plaintiff would fall victim to *a* criminal act" (emphasis added)); *id.* at 338 n 2 ("The specific details of the sexual assault need not have been foreseeable, only that plaintiff in some way would become a crime victim."). If the plaintiff presents facts that would allow a jury to find that the defendant could have foreseen a harm from some general class of criminal activity, such as the risk of assault on the premises, then the remaining question is whether the particular harm that befell the plaintiff resulted from criminal conduct within that general class. Under *Fazzolari*, that is a jury question unless, on the facts alleged in the complaint (when the question is considered at the ORCP 21 A(8) stage of the case, as it is here), or on the evidence adduced (when the question is considered at summary judgment or at trial), (1) no reasonable factfinder could find that the criminal harm suffered by the plaintiff was qualitatively similar to the past criminal activity known to the defendant, *e.g.*, *Uihlein*, 282 Or at 640 (prior incidents of shoplifting did not make harm from a violent assault reasonably foreseeable), or (2) the connection between the alleged act of negligence by the defendant and the criminal harm suffered by the plaintiff is so attenuated that no reasonable factfinder

could find that the defendant was on notice that the alleged act of negligence risked criminal harm to the plaintiff, *e.g.*, *McPherson*, 210 Or App at 618 (criminal harm not foreseeable where risk of harm would have to "result from some strange 'concatenation of highly unusual circumstances' *** [or] an extended sequence of improbable chance occurrences" (quoting *Jefferson Plywood*, 255 Or at 609)).

### B.  *Sufficiency of Plaintiff's Allegations*

With that background, we turn to the question before us: whether the harm that befell Delgado was unforeseeable as a matter of law, as the trial court ruled. Plaintiff argues, as she did below, that Delgado was put at risk of a violent assault while waiting in line and that "[v]iolent criminal assault was the very hazard that [defendants] had a responsibility from which to protect plaintiff's decedent."[7] Defendants, meanwhile, reassert their argument that a "random" shooting is, by its very nature, unforeseeable.

### 1.  *The Zone defendants*

We assume, as did the trial court, that the Zone defendants were aware of prior criminal activity at The Zone and in its general vicinity. That criminal activity included a 2002 shooting at The Zone; "a history of fights and assaults in the line outside the nightclub"; aggressive and confrontational drug users and dealers in the vicinity; and serious enough problems with gang violence and intoxication in the immediate area to necessitate a "bar summit" between police and bar owners, including The Zone's representatives, in 2006. Plaintiff further alleged that The Zone had an employee who was charged with assisting in line control and "distanc[ing] 'undesirables,' *i.e.*, intoxicated persons, harassers, transients, known trouble makers, or gang affiliated persons from guests"—the inference being, in light of the other factual allegations, that security was necessary to protect guests waiting in line.

---

[7] Although much of the discussion in plaintiff's brief refers to the Zone defendants, she "adopts and incorporates" those same arguments with regard to the Rotary defendants, arguing that the "legal principles pertaining to foreseeability are equally applicable to the Rotary defendants."

From those facts, a jury could find that it was reasonably foreseeable that guests waiting in line outside The Zone nightclub would be exposed to criminal activity and would be at risk of a violent assault, including gun violence. That is, a jury could find that The Zone's guests waiting in line were at risk of the general class of criminal harm—violent assault—that had occurred there previously, thus requiring the Zone defendants to take reasonable precautions to protect those guests from such harm. *See McPherson*, 210 Or App at 617-18 (evidence that, among other things, an apartment complex was in a high-crime area that included gunshots, car break-ins, and thefts, and a tenant was threatened by an ax-wielding person, was sufficient to prove foreseeable risk of assault by criminals frequenting the complex and its laundry room, notwithstanding the fact that "no incidents of violence had occurred in the laundry room"); *Cunningham*, 157 Or App at 340 (evidence of the defendant's awareness of risks that intoxicated persons are more likely to be victims of crime and assault, coupled with an ORCP 47 E affidavit regarding foreseeability, was sufficient for a jury to find that the defendant "could have reasonably foreseen that it was placing [the] plaintiff at risk of criminal assault by forcing her to leave the safety of the restaurant before she could arrange for transportation home"); *Torres*, 65 Or App at 215 (holding that the plaintiff had sufficiently alleged that, because of the bank's design and the use of the night deposit, "the general class of harm which a customer might suffer in making a deposit included physical assault by a robber, and that [the plaintiff] was within the general class threatened by such conduct").

Nonetheless, the Zone defendants argue that a risk of violent assault is "simply insufficient as a matter of law" to make Delgado's death foreseeable, because, under *Buchler* and *Stewart*, "a plaintiff must plead and prove that the *specific type of criminal activity* was foreseeable." (Emphasis by the Zone defendants.) Neither *Buchler* nor *Stewart* supports that understanding of the law. Those cases stand for the proposition that a plaintiff must prove that criminal activity was foreseeable in a *specific circumstance*, not that the specific criminal act that harmed the plaintiff was foreseeable. That is, in each case, the court rejected the plaintiff's

attempt to rely on the generic fact that there are criminals in the world who might commit crimes, requiring the plaintiff to put forth concrete facts demonstrating that the defendant was on notice that its negligence risked someone being harmed by criminal activity. *Buchler* and *Stewart* hold that something more than that "theoretical possibility" is required, but neither case requires a plaintiff to prove that a specific type of crime was foreseeable.[8]

Having concluded that the facts alleged by plaintiff establish a general class of foreseeable harm—*i.e.*, violent assault of persons waiting in line outside The Zone—the remaining question is whether plaintiff has alleged facts which, if proved, would permit a reasonable factfinder to find that the criminal harm that Delgado suffered falls within that general class. The trial court reasoned, and the Zone defendants argue on appeal, that the harm to Delgado was qualitatively different from any previous criminal activity that had occurred at or near The Zone, because the shooter, Ayala, was mentally ill and selected a target "at random." Although a reasonable factfinder might well agree with the Zone defendants that Ayala's crime was unforeseeable, such a finding is not *required* as a matter of law. Again, viewing the pleadings liberally, as we must at this stage of the case, we are unable to say that it would be unreasonable for a factfinder to affirmatively reject the Zone defendants' view

---

[8] The dissent points out that, notwithstanding other violent crime that occurred around The Zone in the year leading up to the shooting, "no homicides occurred in the area in 2008 or during the early weeks of January 2009." 271 Or App at 518 (Edmonds, S. J., dissenting). In the dissent's view, the "circumstances that existed in 2005 to 2007, when the last homicides in the district occurred, are of little weight unless they are a part of a pattern that occurred in the past and that continued up to the time of the shooting in this case." 271 Or App at 520 (Edmonds, S. J., dissenting). The dissent does not cite any Oregon case—nor is there one—that holds that a business owner's duty to protect its invitees from third-party criminal activity is triggered only when there is a pattern of a specific crime, such as a homicide, that continues up until the moment of the plaintiff's injury. Nor is there support in Oregon law for the dissent's suggestion that a business owner is only on notice of risks from crimes that occurred in the preceding two years. Although we certainly agree with the dissent that a prior crime could be so remote in time that a court would have to rule that no reasonable factfinder could find that the prior crime made a subsequent crime foreseeable to a defendant, we are unable to reach that conclusion here, particularly in light of the allegations that other types of assaultive conduct occurred in and around The Zone, and that such assaultive conduct, including homicidal conduct, was commonplace in the nightclub industry.

of things and find that the harm suffered by Delgado was similar enough to the prior physical assaults at or around The Zone so as to bring it within the class of crimes that The Zone defendants knew or should have known were likely to occur.[9]

Oregon courts have never required a plaintiff to prove that the precise mechanism of injury or "actual sequence of events" that caused the harm in question was foreseeable. *Fazzolari*, 303 Or at 21; *see Towe v. Sacagawea, Inc.*, 357 Or 74, 106 n 17, 347 P3d 766 (2015) (explaining that the defendant's argument, which focused on the actual sequence of events that injured the plaintiff, "misunderstands foreseeable risk"). Cases involving third-party criminal activity are no different: A plaintiff is not required to prove that the "details" of the crime were foreseeable. *Cunningham*, 157 Or App at 338 n 2. Assaults often can be characterized as "senseless" and "random," and can be committed for any number of reasons, by any number of means or weapons, and against any number of victims. Whether the circumstances of a particular assault—such as the shooter's motive or mental state, the intended victim, or the weapon used—are "details," or instead serve to make the crime qualitatively different from other foreseeable harms, will vary from case to case. Based on the facts alleged in plaintiff's complaint, a reasonable juror could conclude that this type of assault—a gunman firing at patrons waiting in line to enter The Zone—fell within the category of risks that the Zone defendants should have anticipated, regardless of

---

[9] Our deepest disagreement with the dissent is on this point: Who should decide whether the harm to Delgado was qualitatively different from the previous criminal activity that occurred at or near The Zone? The dissent, applying its own formulation of "reasonableness," would give little weight to criminal activity that occurred more than two years before the incident and conclude, as a matter of law, that the harm that befell Delgado was unforeseeable in the absence of a previous and continuous pattern of "random" shootings near The Zone. But, as we understand Oregon law, juries—not judges—are entrusted with applying community standards of reasonableness in negligence cases and, in particular, are entrusted with determining what facts to give little weight and what facts to give greater weight in that calculus. At least since *Fazzolari*, it has been well established that "[t]he jury is given a wide leeway in deciding whether the conduct in question falls above or below the standard of reasonable conduct deemed to have been set by the community. The court intervenes only when it can say that the actor's conduct clearly meets the standard or clearly falls below it." 303 Or at 18 (quoting *Jefferson Plywood*, 255 Or at 607).

the shooter's particular motive, mental state, intended targets, or weapon used.[10]

For the same reason, we cannot say that, as a matter of law, the circumstances alleged in the complaint were so highly unusual, or the sequence of events so attenuated, that no reasonable person in the Zone defendants' position could have anticipated the harm to Delgado. *See McPherson*, 210 Or App at 618 (explaining that probability of harm, and therefore reasonable foreseeability, decreases as the number of steps between a defendant's action and the plaintiff's harm increases). A jury could find, based on the facts alleged in the complaint, that the link between Ayala's crime, the Zone defendants' conduct, and Delgado's death was relatively straightforward: The Zone defendants exposed their invitees to criminal activity when they left them to line up and wait on the street in a high-crime area, whereby a criminal could approach the line and shoot at the invitees. *See id.* (holding that the assault of a tenant by a stranger in the laundry room of the apartment complex "did not result from some strange concatenation of highly unusual circumstances" (internal quotation omitted)). Once again, a jury could find that this particular type of shooting was so highly unusual as to be unforeseeable, but,

---

[10] The dissent adopts defendant's characterization of the incident as a "random" shooting and consistently repeats that description throughout its opinion. *E.g.*, 271 Or App at 517 (Edmonds, S. J., dissenting) ("The only reasonable inference that could be drawn from the circumstances of the shooting as alleged is that it was a completely random event."). The word "random" commonly means "lacking or seeming to lack a regular plan, purpose, or pattern," or "marked by absence of bias : chosen at random." *Webster's Third New Int'l Dictionary* 1880 (unabridged ed 2002). The allegations, though, are susceptible to an inference that Ayala had a specific purpose—to shoot "preppies" or "pop tweens"—and targeted a location, an underage nightclub, where he would find those particular victims. In that respect, the shooting is no more or less "random" than the other shootings and physical assaults in the area that were the product of gang violence, to the extent that gang violence arises from members of one gang targeting another gang at a location where that gang might be found—or so a reasonable factfinder could find. The shooting was "random" in the sense that Ayala could have chosen other places to find those same victims, and, from an emotional perspective, certainly must have felt "random" to the victims and bystanders affected by it, but that does not dictate whether the harm that befell Delgado was reasonably foreseeable to the Zone defendants. A business owner owes a duty to protect its invitees from reasonably foreseeable criminal activity regardless of whether the same crimes are equally likely (or even more likely) to be carried out at some other location.

taking all allegations in the complaint as true, a jury could also find that the shooting was similar enough to the past acts of violence at and around The Zone so as to make it foreseeable.

Thus, we conclude that the trial court erred in dismissing plaintiff's claims against the Zone defendants on foreseeability grounds, and we reverse the limited judgment in their favor. We appreciate the trial court's concern that a club owner might not reasonably be expected to prevent an attempt at "mass murder." However, that concern relates more directly to the standard of care: Did the Zone defendants respond reasonably to the foreseeable risk of a violent assault against someone waiting in line at The Zone? *See Brown*, 297 Or at 710 (explaining that, "where the defendants were aware of the need for security forces," the question is "what would a reasonably prudent person in [the] defendants' circumstances do to protect customers if he knew, or in the exercise of reasonable care should have known, that there were a large number of reports of complaints of crimes in the immediate area"); *accord Towe*, 357 Or at 105 (separately addressing whether the defendant's actions "did not create a foreseeable risk of harm" and whether "its actions were not unreasonable in light of that risk"). And the Zone defendants' motion to dismiss did not put at issue the standard of care or any other element of plaintiff's claim for negligence; it addresses solely the issue of whether plaintiff had adequately pleaded the element of foreseeability.

2. *The Rotary defendants*

We conclude, for reasons similar to those discussed above, that plaintiff sufficiently alleged that the Rotary defendants, acting through the host parents, created a foreseeable risk of harm to Delgado—at least with respect to one of plaintiff's specifications of negligence. Plaintiff's specifications of negligence, which are set out above, 271 Or App at 496-97, include leaving students in a high-crime area. Plaintiff further alleged that the prior crimes in and around The Zone were "publicized in local and/or national media, and [the Rotary defendants] knew, or in the exercise of reasonable care, should have known, about the dangers of

leaving [Delgado] at The Zone nightclub on the date and at the time in question."

Those allegations are sufficient to survive a motion to dismiss on the question of foreseeability. Plaintiff's complaint does not rest on allegations that crime is generally foreseeable, or on a conclusory allegation that The Zone is located in a high-crime area. Rather, plaintiff alleged specific facts that, if proved at trial, would establish that The Zone nightclub had experienced violent crime, including homicidal violence. Assuming, as we must at this stage of the proceedings, the truth of those allegations, and that the host parents were aware of those facts and nevertheless left Delgado there, a reasonable juror could conclude that the host parents' conduct exposed her to a foreseeable risk of violent assault.

The question then reduces to whether a reasonable jury could find that the harm that actually befell Delgado was within that general class. The crux of the Rotary defendants' argument is the same as the Zone defendants—that "[a] random spree shooting is simply not the same thing as the robberies, assaults, burglaries and kidnappings referenced in Appellant's Second Amended Complaint." We reject that argument for the same reasons expressed above: On the facts alleged, we are unable to say that *all* reasonable factfinders would have to agree with the Rotary defendants that the criminal harm that befell Delgado was "not the same thing" as the criminal harms of which the Rotary defendants had notice, and that *no* reasonable factfinder could find that the harm to Delgado fell within the class of harms of which the Rotary defendants are alleged to have been aware.[11]

---

[11] The Rotary defendants contend that "[t]he arguments regarding foreseeability are different with respect to the two respondents. The claim against [the Zone defendants] is based on premises liability, and the allegations in support of that claim differ from the allegations against Rotary, which are based on the alleged existence of a special relationship." Although we agree in the abstract with the Rotary defendants that there are potential differences in how foreseeability is analyzed with regard to each defendant, the Rotary defendants' motion to dismiss was not based on those differences or on what the Rotary defendants, as opposed to the Zone defendants, knew about prior criminal activity at and around the nightclub. Rather, the basis of their motion was the same as the Zone defendants: that is, the prior criminal acts and violence around The Zone were not sufficient to demonstrate that *this shooting* was reasonably foreseeable.

Nor can we say, on the facts alleged, that, as a matter of law, no reasonable person in the Rotary defendants' position could have anticipated the sequence of events that resulted in harm to Delgado. The link between defendants' allegedly negligent conduct and the actual harm that befell Delgado was direct: The host parents knew that there had been a significant history of violent crime at or near The Zone, they took Delgado to The Zone and left her there, and she was the victim of a violent assault. Although a jury might conclude that the host parents could not have reasonably foreseen the consequences of leaving Delgado at The Zone, the chain of events is not, as a matter of law, a "concatenation of highly unusual circumstances" that would preclude as a matter of law a contrary finding. *Jefferson Plywood*, 255 Or at 609.[12] Thus, we reverse the limited judgment dismissing the claims against the Rotary defendants, and we remand for further proceedings.

## IV. CONCLUSION

We emphasize the narrow scope of our holdings in this case. The defendants' motions to dismiss were limited to the question of foreseeability, and that is the only question we have addressed. However, a plaintiff must plead and prove additional elements beyond the foreseeability of

---

[12] Some of the other specifications of negligence by the Rotary defendants, which involve their failure to train host parents, failure to adopt reasonable rules and regulations to ensure student safety and restrict student travel, and failure to warn students and parents of the dangers of high-crime areas, provide a helpful contrast in that respect. For that conduct to expose Delgado to a risk of harm, there are a number of additional contingent steps in play: that, without such training, warning, or rules, the students and host parents would be unable to perceive risks from high-crime areas or ignore those risks; host parents would, in fact, take students into high-crime areas without taking steps to ensure their safety; and that harm would result from that failure. The length of that chain of events might well preclude the conclusion that the harm to Delgado was a foreseeable risk of the particular alleged acts of negligence. However, because the Rotary defendants moved to dismiss the complaint in its entirety, we need only address whether any of the specifications of negligence presents a viable theory. We discuss the specifications concerning the Rotary defendants' failure to train, warn, or adopt and enforce rules and regulations only to the extent that they illustrate, by contrast, the direct relationship between the host parents' alleged knowledge of the dangers and their decision to expose Delgado to that known risk by dropping her off in that area.

the harm to the plaintiff to recover on a negligence claim. Specifically, a plaintiff must plead and then prove "(1) that [the] defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that [the] defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of [the] plaintiff's harm, and (5) that [the] plaintiff was within the class of persons and [the] plaintiff's injury was within the general type of potential incidents and injuries that made [the] defendant's conduct negligent." *Stewart*, 245 Or App at 274-75 (internal quotation marks and citations omitted); *see also Towe*, 357 Or at 87 (explaining that "foreseeability and causation are separate elements" and that foreseeability does not "eliminate[] the plaintiff's obligation to prove, as an element of a negligence claim, cause-in-fact").

We imply no view on any of those other elements of plaintiff's negligence claims against either set of defendants. Similarly, and notwithstanding the dissent's view, our opinion should not be read as imposing strict liability anytime a business is or should be aware of some risk of criminal activity on its premises, or anytime a custodian of a child leaves a child in an area known for crime. We hold simply that, in this case, plaintiff has alleged sufficient concrete facts about the nature of The Zone and its neighborhood that, if proved, would permit a reasonable factfinder to find that (1) the Zone defendants were on notice that, absent appropriate security measures, their patrons were at risk of harm by physical assault, including assault by weapon; (2) the Rotary defendants were on notice that assaultive conduct occurred frequently in The Zone's neighborhood and, thus, on notice that, by leaving Delgado at The Zone, they would be exposing her to the risk that she would become the victim of such assaultive conduct; and (3) the harm that befell Delgado—death by shooting—fell within the class of criminal harms of which both The Zone and the Rotary defendants had notice, making that harm a foreseeable one.

Reversed and remanded.

**EDMONDS, S. J.,** dissenting.

Plaintiff alleges that the Zone defendants[1] negligently caused her decedent's death on January 24, 2009, by allowing her decedent, a club patron, to stand outside the club in a cordoned-off line of people awaiting entrance into the club. The area where the decedent was standing is in a public area within the City of Portland's entertainment district in Old Town/Chinatown. Plaintiff's decedent was shot and killed at that location by Erik Ayala, who had no connection or relationship to the club or to the surrounding area. Plaintiff alleges that, "On the night of the shooting at issue, Erik Ayala went to the Zone nightclub looking to shoot 'preppies' or 'pop tweens,' against whom he may have held a grudge." But, according to plaintiff, the specific risk of harm to her decedent under the above circumstances was legally foreseeable to the Zone defendants because the risk of a random shooting spree was within the general class of reasonably foreseeable hazards connected with the activity of operating an underage nightclub at that location.

Plaintiff's theory of legal foreseeability is belied by the uniqueness of the above circumstances, as will be developed more fully later in this dissent. However, before discussing the legal import of the above circumstances, it is appropriate to consider the legal standard of review that is accorded to plaintiff's allegations, and the rule of law that governs the legal analysis in this case.

The Zone defendants and Rotary defendants moved to dismiss plaintiff's amended complaint under ORCP 21 A on the ground that it failed to state sufficient facts to allege that the risk of harm that resulted in the decedent's death was reasonably foreseeable by defendants. The trial court granted defendants' motions, resulting in this appeal. The only reasonable inference that could be drawn from the circumstances of the shooting as alleged is that it was a completely random event. Nonetheless, plaintiff attempts to

---

[1] On appeal, there are two sets of defendants: the operators of the underage nightclub, who will hereafter be referred to as the "Zone defendants," and the defendants who were connected with the Rotary Exchange program of which decedent was a part, who are referred to in the opinion as the "Rotary defendants."

classify the shooting as a specific risk of harm resulting in injury to her decedent that is within the scope of a general class of reasonably foreseeable hazards, thus making the resulting harm to the decedent legally foreseeable.

In support of her theory, plaintiff alleges four general categories of factual circumstances that were allegedly known or should have reasonably been known to the Zone defendants. She makes allegations about the general culture of "underage nightclubs"; the history of fights and assaults in the line of patrons outside the club; and the history of the excessive use of alcohol and drugs, and gang-related activities within the area. Plaintiff also relies on crime statistics for the years 2006, 2007, 2008, and the early weeks of 2009 for rapes, assaults, robberies, kidnappings, and sex crimes occurring in the downtown neighborhood. According to her allegations, no homicides occurred in the area in 2008 or during the early weeks of January 2009. Three homicides are alleged to have occurred in the neighborhood in 2007 and one homicide in 2006. We do not know from plaintiff's allegations whether those homicides were caused by gunshots. We also do not know from the statistics what assaults or other crimes involved the use of firearms. The "neighborhood" is, according to the allegations, a 52-square-block area within which the entertainment district comprises nine blocks. Additionally, plaintiff alleges two prior instances of shootings within the district, one in 2002 and one in 2005. Pursuant to the applicable standard of review, I assume that plaintiff's allegations are true, and I afford her the benefit of all reasonable inferences that arise therefrom in making the following analysis.

It is helpful to the analysis to observe what plaintiff does allege and what she does not allege. As to the particular claims of negligence against the Zone defendants, plaintiff alleges a different set of facts than she alleges in support of her allegations concerning legal foreseeability. She alleges that the Zone defendants were negligent

"(a)   In failing to take reasonable measures to protect their customers from the criminal acts of third parties;

"(b)   In making their customers stand in line in front of the club;

"(c)   In failing to have sufficient security personnel to protect their customers;

"(d)   In failing to properly train their staff to identify threats to their customers;

"(e)   In failing to identify [the shooter] as a threat while he was in front of The Zone;

"(f)   In failing to have adequate emergency response measures in place to protect customers once a threat was identified; [and]

"(g)   In failing to warn their customers or the parents of their customers about the risk of being assaulted while patronizing The Zone nightclub."

When the allegations of negligence and foreseeability are compared, it is evident that plaintiff does not claim that there were prior instances of random shooting sprees or drive-by shootings of patrons within the entertainment district or at the club prior to January 24, 2009, that are similar to the circumstances of this case and that thereby put the Zone defendants on notice as to a specific risk of harm from a random shooter. (Plaintiff does allege two prior incidents of shooting within the entertainment district, and those allegations will be discussed later in this dissent.) Rather, she can prevail on her claims of negligence only if she demonstrates that the decedent's death was a reasonably foreseeable risk of harm encompassed within the scope of the general risks of harm that she claims defendants should have anticipated in the exercise of reasonable care. *See Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 344, 83 P3d 322 (2004) (rejecting "proximate cause" as a useful inquiry in Oregon tort law).

Identifying the legally proper scope of the general risk of harm that is applicable to the particular circumstances of this case from the allegations of the amended complaint is not an easy task. Plaintiff adopts a diffused rather than a focused approach. That approach is in itself problematic to the analysis, because the more circumstances the description of the general risk of harm encompasses by a proposed definition, the more generalized its scope becomes for purposes of fitting a specific risk of harm

within it that may not reasonably belong in the general harm classification. For example, plaintiff's theory groups crimes of rape, robberies, kidnappings, drugs, other sex crimes, and non-gunshot related assaults and homicides into the same general risk of harm for gun-related assaults and homicides.

In my view, the proper approach is to narrow the scope of general harm to those kinds of crimes that are similar to the circumstances of this crime based on a test of reasonableness. First, that test should consider circumstances as they existed on or about January 2009, at the time of the shooting. Consequently, circumstances that existed in 2005 to 2007, when the last homicides in the district occurred, are of little weight unless they are a part of a pattern that occurred in the past and that continued up to the time of the shooting in this case. Under a test of reasonableness, the crime statistics (by themselves) that plaintiff relies on do not give rise to a reasonable inference that random shooting sprees, or gunshot-related assaults and homicides were a common occurrence or part of a preexisting pattern at the time that the decedent was shot. Indeed, the absence of such allegations could permit a reasonable factfinder to draw the opposing inference. Also, under a test of reasonableness, the other violent criminal activities that plaintiff claims put the Zone defendants on reasonable notice as to the likelihood of a shooting spree are not alleged to have existed at the place and time that the decedent was shot. Finally, even giving plaintiff the benefit of an inference that the Zone defendants' club was located in a "high crime" area and that the Zone defendants operated a youth nightclub that provided a forum for excessive alcohol and drug use and fights, none of these kinds of activities are alleged by plaintiff to have specifically contributed in any way to the decedent being shot by a random shooter.

Nonetheless, along with allegations of a "climate of violence" prior to 2009, plaintiff alleges two prior incidents of shooting within the entertainment district. In one allegation, plaintiff alleges that, "[i]n August 2005, after a string of downtown shootings that left two people dead and four people injured, police blanketed the downtown entertainment district with police officers to ease fear." In

a second allegation, plaintiff alleges: "On or about July 28, 2002, there was another shooting outside The Zone nightclub. Christopher Lambert shot into a crowd of people standing outside The Zone nightclub striking these people."

I am unpersuaded by plaintiff's argument that the above incidents, together with the allegations concerning the Zone defendants' youth nightclub operation and its location in the entertainment district, as discussed above, give rise to a permissible inference that the Zone defendants should have reasonably anticipated the kind of harm that befell the decedent. The shooting incidents are remote in time, and any claim of similarity of the incidents to the facts in this case would require a factfinder to speculate. Two shooting incidents and four unspecified homicides over a period of seven years within a 52-square-block area do not establish a pattern of random shooting of bystanders. The earlier shooting incident occurred in 2002; the more recent shooting incident occurred in 2005 (four years before the decedent was shot) and not at the Zone defendants' location. Indeed, the complaint cites numerous efforts after 2005 by city and police officials and local business owners to combat the criminal activity within the area that separates that time period from 2009. The rule of legal foreseeability of a risk of harm imposes a standard that is based on circumstances that exist on or about the time of the injury to the plaintiff. I would hold that the prior incidents relied on by plaintiff are too remote in time and too qualitatively different to permit a reasonable person to infer any similarity to the circumstances that befell plaintiff's decedent.

Moreover, the allegations of prior shooting incidents are too ambiguous to give rise to a reasonable inference that the risk-creating activity that defendant allegedly engaged in is qualitatively similar to the circumstances of the earlier shootings. According to plaintiff's pleading, the Old Town/Chinatown neighborhood is comprised of 52 square blocks and the entertainment district covers a nine-block district "where many nightclubs and bars are located." The 2005 incident occurred somewhere in the "downtown" area. With respect to the shooting outside the club in 2002, plaintiff's

allegations do not inform the reader whether the victims were patrons standing in line waiting to get into the club, ordinary bystanders, gang members, or of any other reason for their presence. Also, plaintiff's allegations do not inform the reader whether the 2002 shooter was a random shooter, a gang member, or someone who had an intended victim in mind.

In the final analysis of plaintiff's allegations, she is left to rely on the criminal history of the entertainment district (in which no homicides occurred within the year and weeks preceding the decedent's death) and on out-of-state experiences with underage nightclubs as the basis for her claim of reasonable foreseeability. In abstract terms, random shooting sprees and gunshot-related homicides could constitute a separate category of general risk of harm, or they could constitute a specific risk within a general class of risk of harm for foreseeability purposes. A hypothetical contrast illustrates the point. Consider a case where a child at a daycare center is playing outside and is shot during a drive-by shooting. An operator of such a daycare center could reasonably anticipate that risk of harm to the child if random drive-by shootings or gunshot homicides occurred in the area on a regular basis. It would follow that the risk of harm to the child could be legally foreseeable because the specific risk to the child is within the general risk of gunshot homicides and random shootings. In contrast to the hypothetical, the alleged circumstances in this case do not involve regular incidents of random or drive-by shootings, or gunshot-related homicides.

In summary, the very tragic specific harm that befell plaintiff's decedent was the result of a random shooter who was mentally ill and who undertook to shoot "preppies." The randomness of his criminal target demonstrates that it could have just as well have been committed at a soccer or football game, an outside youth church or synagogue gathering, a mall, a public or private school event, or any place where young people typically gather. Giving plaintiff the benefit of all reasonable inferences, it was a mere happenstance that the shooter chose the line of young people outside the Zone defendant's club as his target. For purposes of reasonable foreseeability, a specific risk of harm is only within

the scope of a general risk of harm if the specific risk of harm resulting in the injury is qualitatively similar to other foreseeable specific risks of harm that fall within a general risk of harm. That test is not satisfied by plaintiff's allegations. The circumstances of the random shooting spree in this case are unrelated to plaintiff's "high crime area" allegations. For these reasons, the specific risk of harm from a random shooting spree like the one in this case is not within the general risk of harm alleged by plaintiff.

Plaintiff's allegations against the Rotary defendants suffer from a similar flaw. Plaintiff alleges in substance that the Rotary defendants were negligent because it was reasonably foreseeable that the decedent would be exposed to an unreasonable risk of harm due to the alleged high-crime area in which the club operated and the perils of underage nightclubs. That argument appears to be an argument that no reasonable parent would have permitted their child to attend the underage nightclub for safety reasons. Even if that is not plaintiff's argument, it is difficult to imagine how any parent could have reasonably anticipated the risk of harm from a random shooter. Additionally, whatever reasonably anticipated risks of harm (harm from alcohol, drugs, or fights) existed, plaintiff's decedent was not killed as the result of one of those risks. Rather, she was randomly killed as the result of a harm that no reasonable parent could have anticipated or prevented. The analysis regarding whether the specific harm that befell the decedent is within the scope of reasonably anticipated general harms applies equally to the Rotary defendants, and I would affirm the trial court on the rulings as to both sets of defendants for these reasons.

Finally, this case has important policy implications. The majority's conclusion effectively implies that the highly-policed nine-block entertainment district within the largest city in Oregon was a dangerous place subject to ongoing criminal violence against ordinary citizens in 2009 and that business operators, by operating their businesses within that district, risked injury to their patrons because of random criminal activities of third parties who were not within the operators' control. In defining what constitutes a general class of harm for foreseeability purposes, the majority's

opinion expands the concept of general risk of harm far beyond the practical realities of what business operators, parents, and *de facto* guardians should reasonably anticipate as risks of harm. In the end, the expansiveness of the majority's holding regarding the general class of risk of harm turns the policy that actionable negligence must be based on reasonable foreseeability on its head.

I dissent for these reasons.