Argued and submitted January 14, reversed and remanded September 16, 2015, petition for review denied March 24, 2016 (358 Or 833)

Kimberlee RHODES,
guardian *ad litem* for
Victoria L. Rhodes, a Minor,
*Plaintiff-Appellant,*

*v.*

U.S. WEST COAST TAEKWONDO
ASSOCIATION, INC.,
an Oregon corporation, et al.,
*Defendants,*

*and*

TIGARD-TUALATIN SCHOOL DISTRICT,
*Defendant-Respondent.*
Multnomah County Circuit Court
110101387; A154975

359 P3d 1196

James S. Coon argued the cause for appellant. With him on the briefs was Swanson Thomas, Coon & Newton.

Matthew J. Kalmanson argued the cause for respondent. With him on the briefs was Hart Wagner LLP.

Before DeVore, Presiding Judge, and Hadlock, Judge, and Garrett, Judge.

GARRETT, J.

DeVore, J., dissenting.

**GARRETT, J.**

This is a negligence action brought on behalf of a six-year-old girl who was injured in a public swimming pool. Plaintiff, the child's guardian *ad litem*, sued multiple defendants, including the Tigard-Tualatin Aquatic District, which operated the pool, and the Tigard-Tualatin School District, which was the previous operator of the pool until it transferred the operation to the aquatic district 50 days before the accident. The issues on appeal concern plaintiff's attempt to impose liability on the school district. The trial court granted the school district's motion for summary judgment, concluding that plaintiff had failed to articulate a theory of negligence whereby it was reasonably foreseeable that the school district's conduct as the pool operator would create a risk of injury after the pool operation was transferred to a new entity.

On appeal, plaintiff assigns error to that ruling. Plaintiff also assigns error to the trial court's denial of plaintiff's motion to amend her complaint following the grant of summary judgment. For the reasons that follow, we conclude that plaintiff's complaint, construed in the light most favorable to plaintiff, adequately pleaded that the school district was negligent in its operation of the swimming pool up through the date of the transfer to the aquatic district, and that, under the circumstances of that transfer, it was reasonably foreseeable that the risks created by the school district's negligence would remain for a period of time under the aquatic district's management. We then conclude that the trial court erred in ruling—based, perhaps, on an overly narrow construction of plaintiff's allegations—that the risks of injury as a result of any negligence by the school district were unforeseeable as a matter of law because of the transfer of the pool operation to the aquatic district. We further reject the arguments made by the school district on appeal that the transfer of the pool operation to the aquatic district necessarily cut off the school district's liability for its own negligence. Accordingly, we reverse the judgment and remand for further proceedings.

## BACKGROUND

We begin with an overview of the summary judgment record, "viewing the facts and all reasonable inferences

that may be drawn from them in the light most favorable to plaintiff, as the nonmoving party." *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 332, 83 P3d 322 (2004).

On August 20, 2010, plaintiff brought her daughter, Victoria, to a summer program run by the U.S. West Coast Taekwondo Association (Taekwondo Association). Activities that afternoon included swimming at the pool located at Tigard High School. While the program participants were at the pool, Victoria was found motionless underwater. When medical workers arrived at the scene, Victoria did not have a pulse and was not breathing. She survived but suffered permanent injuries.

On the date of injury, the pool was operated by the newly established aquatic district, which had acquired control of the pool 50 days earlier from the school district.[1] Four employees were on duty, including three lifeguards. The aquatic district had leased the facility pursuant to a "Pool Facilities Lease and Operations Intergovernmental Agreement" ("lease" or "intergovernmental agreement") from the school district. The lease provided that, as of July 1, 2010, the aquatic district was responsible for operating and maintaining the pool and for the pool's employees. Its responsibilities included hiring and managing personnel to staff the pool, meeting facility inspection requirements, ensuring that lifeguards and other supervisory employees have required certifications, and employing a pool manager to supervise pool operations. The lease required the aquatic district to offer employment to any former pool employees of the school district. The pool's aquatic director and the four employees who were on duty at the time of the incident had been previously employed by the school district.

The lease also provided that the aquatic district

"shall establish rules and regulations, including safety and sanitary standards, for use of the Facility, consistent with state regulations. These rules and regulations shall be

---

[1] The aquatic district was created as a result of voters' approval of Ballot Measure 34-176. The purpose of the measure was to keep the pool open for public use, because the school district had announced that it planned to permanently close the pool facility in July 2010.

followed at all times by persons using the Facility, including [school district] employees and participants."

The aquatic district adopted its set of safety policies on August 11, 2010, 41 days after the lease became effective and nine days before Victoria's accident.

Plaintiff brought negligence claims against the Taekwondo Association and the aquatic district, alleging that they failed to keep a "proper look-out" over Victoria in the pool or failed to train staff to do so. Plaintiff later added the school district as a defendant, alleging that the school district failed to properly train its former staff (who became employees of the aquatic district) to keep a proper look-out in the pool. Following the school district's ORCP 21 motion to make more definite and certain, plaintiff filed her second amended complaint, the operative pleading for purposes of this appeal.

The second amended complaint alleged that the school district "operated the [pool] until July 2010, trained the persons who were staffers at the pool on the date of [the injury], and put in place certain procedures that remained in effect on the date of [the] incident." In eight specifications of negligence, plaintiff alleged that the school district and aquatic district were negligent,

"a. In failing to require lifeguards to use the pool's elevated lifeguard chairs for patron surveillance;

"b. In failing to set procedures for staff and visiting groups on what to do when a youthful patron cannot be seen or is missing;

"c. In failing to create, establish and train staff on an emergency action plan to follow when a group uses the pool;

"d. In failing to require immediate lifeguard intervention when a patron is submerged and motionless in the pool for more than 30 seconds;

"e. In failing to create, establish and put into place procedures on how to use the sign in sheet or patron admission procedure to obtain an accurate patron count so lifeguards would know how many patrons were using the pool;

"f. In failing to create and establish procedures to require lifeguards to conduct swim tests of group members

before they get into the pool, set and communicate procedures to group leaders, and set and enforce in-pool rules on where non-swimmers are allowed to go in the water so as to keep non-swimmers safe;

"g.  In failing to maintain current lifeguard certification for the facility's aquatic director;

"h.  In failing to have a policy of actively prohibiting pool users from engaging in breath holding contests because of the dangers of hyperventilation and loss of consciousness."

As to the school district, paragraph 13 of the second amended complaint alleged as follows:

"It was reasonably foreseeable that [the school district's] actions * * * would create an unreasonable risk of harm to pool patrons like [Victoria] after the transfer of operation of the pool to [the aquatic district] because such deficiencies may not be identified and remedied in time to avoid the injury which occurred in this case."

The school district moved for summary judgment, arguing that it could not be held liable for Victoria's injury as a matter of law, for two reasons. First, the school district characterized plaintiff's claim as alleging "employment-related negligence" and argued that it owed "no duty" as a matter of law because it no longer employed the persons who were alleged to have been negligent. Second, the school district argued that the injury to Victoria was not a foreseeable consequence of the school district's alleged negligence because the alleged negligence by the aquatic district, the operator of the pool at the time, was a superseding cause of the injury. As an alternative basis for summary judgment, the school district argued that plaintiff had failed to give timely tort claim notice as required by ORS 30.275.

In response to the motion, plaintiff argued that her negligence theory was not based on the school district's status as a former employer; rather, it was that the school district "passed over this whole operation, including those dangerous defects" in policies and management, and that it was "reasonably foreseeable that an unsafe pool policy or procedure will persist for some period after the transfer of control from one pool operator to another."

In its "Opinion on Summary Judgment" dated June 19, 2013, the trial court was not persuaded by either party in full. The court apparently rejected the school district's first argument, which framed the issues in terms of "duty" or "no duty." The court reasoned that, although the aquatic district owed a "special duty to plaintiff to make the premises reasonably safe" by virtue of its status as the pool operator, plaintiff's theory against the school district was not predicated on any particular status held, or duty owed, by the school district. Rather, the court viewed plaintiff's claim against the school district as implicating the basic foreseeability principle set out in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987). As to that issue, the court did not adopt the school district's view that the transfer of the pool operation to the aquatic district, in conjunction with the alleged negligence of the aquatic district, was a superseding cause that cut off the school district's liability. Rather, the court determined that the injury to Victoria was simply not a reasonably foreseeable consequence of the school district's negligent conduct as alleged by plaintiff. The court reasoned as follows:

> "The 'conduct' that plaintiff alleges is training and supervision of employees of the school district, and institution of procedures while the school district was controlling and operating the pool facility.

> "It requires no exhaustive analysis to find that no reasonable finder of fact could conclude that <u>at the time of that conduct</u> (that is, when the school district was itself running the pool facility), the school district could [] reasonably foresee that its practices in running the pool would result in bad habits by employees when they went on to work under a different employer and that these habits would threaten patrons of later employers, who would fail to take measures to protect people like [Victoria], a patron of that other pool operation. The fact that, as ultimately happened, it turned out that the new aquatic district hired all the staff, and it had no experience, and so carried on with previous policies, is all history unfolding after the conduct. Nothing in the allegations or the materials on summary judgment show <u>that at the time of the conduct</u> condemned as negligent, the school district should have acted in view of any such future developments. At the time of the conduct in

question, it could not reasonably be foreseen that supervision and training for employees for the school district and procedures for the school district's pool would carry over to some future employer and operator of the pool, and result in harm.

"If it were otherwise, then various juries would be allowed to make various decisions about the foreseeability that any employee, training in one job, would acquire bad habits ultimately harming a future patron of the next employer, or the employer three or four removes away. This is clearly beyond what can be held 'reasonably' foreseeable.

"* * * Again, the facts alleged and shown do not support an inference that at the time of the conduct in adopting the procedures and continuing them, it could have been reasonably foreseeable that the subsequent operator would rely upon these procedures, and that a patron of that subsequent operator would have been injured as a result.

"In argument, plaintiff asserted that the contracting parties as part of the hand-off of the pool operation contemplated that the rules and regulations of the school district would be adopted and carried on without interruption by the aquatic district.

"If it were alleged and proven that the school district made a distinct recommendation of its set of rules and regulations to the aquatic district, knowing of the lack of experience and the reliance of the [latter] on the preexisting operation, it might well be that specific conduct—the conduct of supplying the rules and advising the aquatic district to follow them—could be conduct which would foreseeably threaten the safety of [Victoria] in the manner that occurred. I stress that liability on that basis is not now alleged."

(Underscoring in original.)

After the court's order on summary judgment, plaintiff moved to amend her complaint. Plaintiff's proposed amendment contained additional allegations regarding her theory that the school district had been negligent in its transfer of the pool operation to the aquatic district. The proposed amendment did not, however, include the allegation that the trial court had deemed necessary in its summary judgment

opinion, namely, that the school district had "recommended" that its policies and procedures be adopted by the aquatic district. At the hearing on plaintiff's motion, plaintiff conceded that there was no evidence of such a recommendation. The trial court denied plaintiff's motion, explaining that, "[i]t's either the same theory that was disposed of by summary judgment, in which case that's not a reason to amend to allow [plaintiff] to restate it, or it's a different theory. Either way, it's just too late to try to incorporate into a case that's required two and a half years to prepare and give the defense two weeks to work on it."

## DISCUSSION

A party is entitled to summary judgment if it can show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. ORCP 47 C. In an appeal from a trial court's grant of summary judgment, we view "the facts and all reasonable inferences that may be drawn from those facts in the light most favorable to the nonmoving party." *Schmidt v. Mt. Angel Abbey*, 347 Or 389, 392, 223 P3d 399 (2009).

At issue on appeal is plaintiff's claim against the school district for common-law negligence. Under Oregon law, "unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." *Fazzolari*, 303 Or at 17. Even where a status or a special relationship is implicated that creates a basis for the defendant's duty, "the scope of that [particular] duty may be defined or limited by common-law principles such as foreseeability." *Oregon Steel Mills*, 336 Or at 342. Since *Fazzolari*, Oregon courts have "discussed a defendant's liability for harm that the defendant's conduct causes another in terms of the concept of 'reasonable foreseeability,' rather than the more traditional 'duty of care.'" *Id.* at 340. However, "[e]ither formulation—duty or foreseeability—is a method of describing how the law limits the circumstances or conditions under which one member of society may expect another

to pay for a harm suffered." *Buchler v. Oregon Corrections Div.*, 316 Or 499, 509, 853 P2d 798 (1993).

"Foreseeability ordinarily presents questions of fact; however, where no reasonable juror could find that the kind of harm that befell the plaintiff was the foreseeable result of the defendant's negligent act, the harm is unforeseeable as a matter of law." *Lasley v. Combined Transport, Inc.*, 234 Or App 11, 16, 227 P3d 1200 (2010), *aff'd*, 351 Or 1, 261 P3d 1215 (2011) (citing *Buchler*, 316 Or at 509).

On appeal, plaintiff argues that the trial court erred in several respects. First, plaintiff argues that the court appeared to misconstrue plaintiff's allegations as to *when* the school district was negligent. Plaintiff cites some language in the trial court's summary judgment opinion, and comments made by the court at the hearing, that suggest that the court understood plaintiff to be alleging negligence in the adoption and implementation of certain policies and procedures years before the transfer to the aquatic district, rather than negligence in the operation of the pool up through the date of transfer. That misconception, plaintiff argues, affected the court's assessment of whether it was foreseeable that the school district's negligence would create a risk of injury to swimmers after the operation was transferred to the aquatic district.

Second, plaintiff argues that, to the extent that the trial court correctly understood plaintiff's theory of when and how the negligent conduct occurred, the court simply erred in concluding that Victoria's injury was, as a matter of law, not a reasonably foreseeable consequence of that negligence. Plaintiff's argument is straightforward: The school district handed over to the aquatic district a "turnkey" swimming pool operation with defective policies and procedures and inadequately trained employees; under those circumstances, it was foreseeable that the risks created by the school district's negligence would continue to exist for a period of time under the new management. Plaintiff points out that, among other things, the aquatic district was a new entity created by the voters, it had no prior experience operating a swimming pool, the intergovernmental agreement between the school district and the aquatic district

contemplated a "transition year" after the effective date of the transfer, and the agreement required the aquatic district to offer jobs to the pool employees of the school district. Plaintiff argues that the trial court erred in reasoning that, notwithstanding those circumstances, the school district could not have foreseen any post-transfer risks resulting from its pre-transfer conduct unless it had "recommended" that the aquatic district adopt the school district's own policies and procedures.

Third, plaintiff argues that, if the trial court correctly concluded that the allegations and evidence at summary judgment were insufficient as a matter of law to allow for the imposition of liability on the school district, then the court erred in denying plaintiff's motion for leave to amend the complaint.

The school district, in response, argues that the trial court correctly construed plaintiff's second amended complaint and that that complaint did not allege negligence in the "transfer" of the pool operation. Rather, the school district contends, the pleading's eight specifications of negligence all relate to the adoption and implementation of policies and training of employees at some time before the transfer. The complaint alleges, in a subsequent paragraph, that it was foreseeable that those previous acts of negligence would create an unreasonable risk of injury after the transfer—but that allegation pertains to *foreseeability*; that is, as the school district sees it, plaintiff does not allege negligent *conduct* in the transfer itself.

The school district next argues that the trial court correctly granted summary judgment based on its interpretation of the second amended complaint. In other words, the court correctly understood plaintiff to be alleging negligent conduct at a time before the transfer and correctly reasoned that it was not "reasonably foreseeable that the adoption of rules and [] training of employees would harm business invitees of some future operator of the pool."

The school district next argues that, even if the trial court erred in its construction of the second amended complaint—that is, even if plaintiff should properly be understood to have alleged a theory of negligence in the transfer of

an unsafe pool operation—the grant of summary judgment should still be affirmed because the school district cannot, as a matter of law, be liable for an injury that occurred after the transfer. The school district's bases for that argument will be discussed in detail later in this opinion.[2]

The issues in this case, as framed by the parties at summary judgment and decided by the trial court, require us to address several distinct questions. We begin, however, by emphasizing what is not at issue on appeal. Neither the school district's motion for summary judgment, nor the trial court's opinion granting that motion, took issue with the factual allegations in plaintiff's complaint. That is, the school district did not argue that plaintiff had failed to produce evidence sufficient to create a genuine issue of material fact as to the truth of those allegations. The issues at summary judgment, therefore, had nothing to do with whether the school district's policies and procedures, or its training and supervision of employees, were actually deficient at the time that the school district was in control of the swimming pool. The issues at summary judgment related solely to the legal effect of the transfer of the pool operation to the aquatic district. The school district argued, in essence, that, even assuming that the school district acted negligently as the pool operator, that is legally irrelevant because the transfer cut off the school district's liability for future injuries as a matter of law.

In short, the issues before us on appeal are narrow. The first question is whether plaintiff adequately alleged that the injury to Victoria was a reasonably foreseeable consequence of the school district's conduct, including its conduct in connection with the transfer of the pool operation. The second question is whether, assuming that plaintiff adequately alleged that the school district's conduct created a foreseeable risk of the kind of harm that befell Victoria, the school district nonetheless cannot be held liable for the injury as a matter of law because of the transfer to the aquatic district.

[2] As noted, the school district also argued to the trial court that plaintiff's claim should be dismissed for failure to comply with the tort claim notice requirements under ORS 30.275. The school district renews that argument on appeal as an alternative basis for affirmance. We reject that argument without published discussion.

The trial court's opinion is somewhat unclear as to how it construed the second amended complaint. Plaintiff argues that the court interpreted the complaint too narrowly by characterizing plaintiff as focusing on the "adoption" and "institution" of defective policies, and the "training" of employees, well before the transfer. Some language in the trial court's opinion does suggest that the court understood plaintiff to be alleging negligence in the acts of adopting procedures and training employees. Other language, however, suggests that the court understood that plaintiff's theory of negligent conduct was more temporally fluid. For example, the court referred to "the time of that conduct (that is, when the school district was itself *running* the pool facility)"; the court also questioned whether "the school district could [] reasonably foresee that its practices in *running* the pool would result in bad habits by employees." (Emphases added; underscoring omitted.) The court also described plaintiff's allegations as implicating the school district's "conduct in adopting the procedures and *continuing* them." (Emphasis added.)

In light of those references, we believe that the trial court interpreted the second amended complaint to allege negligent conduct over a period of time in the operation of the pool, not merely in the adoption of rules or procedures or the hiring and training of employees at discrete moments in the past. Moreover, we agree with that interpretation. Although there is some imprecision in the allegations, when they are construed in the light most favorable to plaintiff, the express reference in paragraph 13 of the complaint to "after the transfer" is sufficient to show that plaintiff alleged that the school district acted negligently in running a defective swimming pool operation up through the date of transfer to the aquatic district. In our view, the complaint's theory of negligence can be read to encompass the failure to remedy such defects before transferring the operation to a new owner that was likely to continue the operation in its existing state, at least for a time.

The trial court appears to have determined that, although plaintiff was attempting to allege negligence associated with the transfer to the aquatic district, that effort

failed because, as a matter of law, the school district could not have foreseen, at the time of its own negligent conduct, that that conduct would pose an unreasonable risk of injury once the pool was under new management. Of paramount importance to the trial court was that the aquatic district, under the lease, was to adopt its own policies and procedures, and that plaintiff did not allege that the school district had "recommended" that any of the old policies and procedures be carried forward. The school district makes that same argument on appeal.

We respectfully disagree with that analysis. If one construes the second amended complaint, as we do and as it appears that the trial court did, to allege that the school district's negligent conduct included the transfer of an unsafe swimming pool operation, it is not apparent why it should matter whether the school district specifically recommended that its policies and procedures be adopted by the new management. The relevant question, in our view, is whether it was reasonably foreseeable that the aquatic district would carry on those policies and procedures. The summary judgment record contains sufficient evidence to create a genuine issue of fact on that question. The mere fact that, under the intergovernmental agreement, the aquatic district was to adopt its own policies at an unspecified time does not foreclose the likelihood that the aquatic district would, for at least some time after the transfer, rely heavily on the policies, procedures, and employees that it inherited from the school district.

In short, we disagree with the trial court's view that "it could not reasonably be foreseen that supervision and training for employees for the school district and procedures for the school district's pool would carry over to some future employer and operator of the pool." As we understand it, the court's view was based not on the *factual* circumstances of the transfer so much as a concern, expressed in the next paragraph of the court's opinion, that, "[i]f it were otherwise, then various juries would be allowed to make various decisions about the foreseeability that any employee, training in one job, would acquire bad habits ultimately harming a future patron of the next employer, or the employer three or

four removes away." Although we acknowledge the validity of the court's concern in the abstract, we do not believe that it is implicated by the allegations and evidence in this case. This is not a situation where a plaintiff alleges merely that a former employer is liable for a poorly trained employee's actions under a subsequent employer. Plaintiff's theory is that, under the particular circumstances of this transfer of the pool operation, in which the school district and the aquatic district collaborated closely to hand over the operation (to the point that the aquatic district was *required to offer employment* to the employees of the school district), it was foreseeable that the risks of injury created by the school district's negligence would persist after the transfer. Whether that is true is a question for the jury.

The school district contends that to allow plaintiff to reach the jury with this theory of liability amounts to an "extension" of *Fazzolari*. But the authorities on which the school district relies are not on point. For example, the school district argues that the Supreme Court's decision in *Boothby v. D.R. Johnson Lumber Co.*, 341 Or 35, 137 P3d 699 (2006), precludes plaintiff's theory. In *Boothby*, the defendant owned the timber rights to a piece of land and hired a contractor, Intermountain, to harvest the timber. Intermountain employed the plaintiff's husband, who died in a logging accident on the property. The plaintiff brought claims against the defendant for, among other things, common-law negligence. The defendant argued that it was not liable as a matter of law because of Intermountain's status as an independent contractor. The Supreme Court agreed, reasoning that, under *Fazzolari*, the defendant's potential liability was defined and limited by Intermountain's status as an independent contractor. *Id.* at 45-46. The court first noted the general rule that "a person who hires an independent contractor is not liable to the contractor's employees for injuries that they sustain while performing contracted work." *Id.* at 46. The court then explained that an exception to that general rule exists: "[I]n certain circumstances, a person who provides an unsafe work site may be liable to an employee of an independent contractor for injuries that the employee sustains on the work site." *Id.* at 47 (citing *Yowell v. General Tire & Rubber*, 260 Or 319, 490 P2d 145 (1971)).

The defendant in *Boothby* provided the land, but there was no evidence that "any defect in that tract led to the accident." *Id.* Thus, the court determined that there was no reason to apply the *Yowell* exception; rather, the court applied the general rule that "Intermountain's status as an independent contractor limited [the defendant's] liability in negligence to Intermountain's employees." *Id.*

The school district's view that *Boothby* controls this case is based on its contention that plaintiff's claim, as in *Boothby*, implicates a particular status. In *Boothby*, it was Intermountain's status as an independent contractor; the Supreme Court held that, under settled principles, that status defined and limited the defendant's duties to Intermountain's employees. Here, the school district argues, plaintiff's claim implicates the school district's status as the former employer of individuals who are asserted to have acted negligently, and, under settled principles, the school district's duties arising out of that status terminated when the employment relationship ended. The flaw in the school district's argument (as the trial court appeared to recognize) is that plaintiff's theory of liability on the part of the school district does not rest on a status relationship. Plaintiff does not argue that the school district has *respondeat superior* liability for the negligence of others. Plaintiff argues that the school district acted negligently in its own right by, among other things, implementing defective policies and procedures and running a dangerous pool operation through the date of transfer to the aquatic district. Accordingly, *Boothby* is inapposite. *See Bailey v. Lewis Farm, Inc.*, 343 Or 276, 284 n 4, 171 P3d 336 (2007) (explaining that, where the plaintiff's theory of negligence was based on the defendant's *own* conduct at the time that the defendant was in control of a tractor-trailer that later caused injury, "*Boothby*'s reasoning does not advance [the] defendant's argument").

The school district also argues that it is shielded from liability under the rule stated in the *Restatement (Second) of Torts* § 452(2) (1965). That rule provides as follows:

"(1)  Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened

by the actor's negligent conduct is not a superseding cause of such harm.

"(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to the third person, the failure of the third person to prevent such harm is a superseding cause."

Comment d to subsection 452(2) explains as follows:

"Subsection (2) covers the exceptional cases in which, because the duty, and hence the entire responsibility for the situation, has been shifted to a third person, the original actor is relieved of liability for the result which follows from the operation of his own negligence. The shifted responsibility means in effect that the duty, or obligation, of the original actor in the matter has terminated, and has been replaced by that of the third person."

The school district argues that this is the type of "exceptional case" contemplated by subsection 452(2) and comment d, principally because all responsibilities for the pool were transferred to the aquatic district by express intergovernmental agreement pursuant to a voter-approved ballot measure.

We disagree. As a preliminary matter, whether subsection 452(2) reflects the law in Oregon is an open question. *See, e.g., Bailey*, 343 Or at 286 ("We need not decide whether [cases applying the rationale of subsection 452(2)] are consistent with Oregon negligence law; that is, we need not decide whether those factors, or some combination of them, would be sufficient to permit a court to say, as a matter of law, that defendant is completely excused from the consequences of its prior negligence.").

Even assuming, however, that Oregon negligence law incorporates the notion of the "exceptional case" contemplated by subsection 452(2), this is not an exceptional case where we could conclude, as a matter of law, that the school district is relieved of liability for its past conduct. That conclusion is informed by additional *Restatement* comments and illustrations that accompany subsection 452(2). For example, comment e cautions that, although there may

be circumstances in which "responsibility may be shifted []
by express agreement,"

> "[i]n many cases this is not possible, since there are
> duties and obligations which cannot be delegated or shifted
> to another; and where the personal safety of third persons
> is threatened, it is probably true that normally any duty
> to exercise reasonable care for their protection cannot be
> shifted."

Two illustrations to the subsection are also
illuminating:

> "7. A leases a building to B for use as a motion picture
> theatre, to which the public will be admitted. The building
> is at the time in a defective and dangerous condition. The
> lease expressly provides that B will repair it and put it into
> safe condition for the admission of the public, and that the
> public will not be admitted until this has been done. B fails
> to make the necessary repairs, and opens the theatre with-
> out making it safe. C, a member of the public entering the
> theatre, is injured by the collapse of a defective stairway. A
> is not liable to C.

> "8. The same facts as in Illustration 7, except that the
> lease provides only that B will make the necessary repairs,
> without any provision that the public will be excluded until
> this is done. The full responsibility is not shifted to B, and
> A is not relieved of liability to C."

Finally, comment f notes that, even without an
express agreement, "the circumstances may be such that
the court will find that all duty and responsibility for the
prevention of the harm has passed to the third person."
The comment notes that whether that is so will depend on
"[v]arious factors," including

> "the degree of danger and the magnitude of the risk of
> harm, the character and position of the third person who is
> to take the responsibility, his knowledge of the danger and
> the likelihood that he will or will not exercise proper care,
> his relation to the plaintiff or to the defendant, the lapse of
> time, and perhaps other considerations."

Several features of the transfer of the swimming
pool operation from the school district to the aquatic dis-
trict, in our view, preclude the school district's argument

that this is an "exceptional case" as a matter of law. First, although the school district alludes to the intent of "the voters" that the school district be "relieved" of its obligations to others, the school district does not explain how that intent, even if expressed, could operate to relieve the school district of its liability to plaintiff. In any event, the record does not indicate that an intention to absolve the school district from the consequences of its past conduct was made express in either the ballot measure or the intergovernmental agreement that effected the transfer. Second, the transfer in this case was fundamentally different from the one described in Illustration 7 to subsection 452(2). That illustration would shield "A" from liability where the dangerous condition of the movie theater was within the express contemplation of the parties and "B" was contractually required to make the theater safe before admitting the public. The record before us does not indicate that the aquatic district was ever made aware of any dangerous defects in the swimming pool operation, much less that it was required to remedy such defects before allowing swimmers to enter. This case is, if anything, more like Illustration 8, where A is *not* relieved of liability (but it falls short of even that illustration, as the aquatic district was not contractually required to remedy any defects in the pool operation).

Finally, the various "factors" mentioned in subsection 452 and the accompanying comments—that is, the factors that might, under certain circumstances, "permit a court to say, as a matter of law, that defendant is completely excused from the consequences of its prior negligence," *Bailey*, 343 Or at 286—do not counsel in the school district's favor. The risk of serious injury attributable to a negligently operated public swimming pool is obvious, and the nature of the transfer would permit a jury to conclude both that the aquatic district was unaware of any existing danger and that it would carry on the operation in its existing state, at least for a time. Prominent among the "exceptional case" factors is the "lapse of time," which is mentioned in the text of subsection 452(2) itself as well as in the comments. The injury in this case occurred just a few weeks after the transfer, under circumstances that, a jury could conclude, made it foreseeable that the same risks that existed the day before

the transfer would continue to exist: The aquatic district was new and inexperienced, and it inherited the school district's pool employees by express agreement.

For the foregoing reasons, we conclude that the trial court erred in granting the school district's motion for summary judgment.[3]

Reversed and remanded.

**DEVORE, P. J.,** dissenting.

Based solely on foreseeability, this case decides the liability of a school district, the prior operator of a swimming pool, after an aquatic district became the successor operator of the pool at which a child nearly drowned. This case asks whether, while operating a swimming pool in the past, the

---

[3] The dissent relies on a line of cases beginning with *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993). Those cases all address whether a defendant may be held liable in negligence for the harm caused by a third party's criminal conduct. As we recently observed, in those cases, courts have "struggled with how to formulate the foreseeability element of the claim and, in particular, with how to characterize the 'risk of harm' that must be foreseeable." *Piazza v. Kellim*, 271 Or App 490, 503, 354 P3d 698 (2015). Although it is difficult to discern "bright line rules," *McPherson v. Oregon Dept. of Corrections*, 210 Or App 602, 617, 152 P3d 918 (2007), we have held, at a minimum, that the general proposition that "criminals may commit crimes" that cause harm is an insufficient predicate for a defendant's liability. *Buchler*, 316 Or at 511-12 ("[I]n our society it is foreseeable that crimes may occur and that the criminals perpetrating them may cause harm. Thus, in a general sense, it is foreseeable that anyone whose conduct may in any way facilitate the criminal in committing the crime has played some part in the resulting harm. But mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it."). In subsequent cases, we have considered what level of specificity is required for a plaintiff to sufficiently allege that a particular risk of harm from criminal conduct was foreseeable to the defendant; that endeavor has proved elusive. *See, e.g., McPherson*, 210 Or App at 614-15 (observing that "the cases from the Oregon appellate courts are not altogether consistent with respect to the degree of similarity that must exist, in order for harm to a plaintiff to be considered 'foreseeable,' between that harm and earlier occurring harms or events of which the defendant is (or should be) aware").

Again, those cases all concern the particular context of a defendant's liability for the "intervening intentional criminality of another person." *Buchler*, 316 Or at 511. Although the dissent is correct that a heightened foreseeability analysis applies in those cases, this is not such a case. Tellingly, although the school district made a brief reference to *Buchler* in its arguments to the trial court, the school district on appeal does not rely on *Buchler* or other cases involving third-party criminal conduct. In our view, because this case does not involve any allegation of intervening criminal conduct by a third party, the ordinary foreseeability analysis applies; *Buchler* is inapposite.

prior operator of the pool should reasonably have foreseen the later risk of a child's injury after the successor operator takes over the pool, because the successor operator adopted the prior operator's policies and hired the prior operator's employees.

This question of foreseeability occurs within the context of an all-important fact. The successor entity, the Tigard-Tualatin Aquatic District, operated the pool at the time of the child's injury. Therefore, the precise question of liability for the court was whether defendant, the Tigard-Tualatin School District, knew or had reason to know, when the school district operated the pool, that the successor entity would operate the pool so as to cause an unreasonable risk of injury. This is a question of the school district's liability for its contribution to a third party's conduct that was the immediate cause of injury. When the question is recognized to involve not just the conduct of the defendant but also the conduct of a third party, Oregon law provides an answer.

The trial court correctly answered that the injury to plaintiff's child, occurring after the transfer of pool operations, was not the reasonably foreseeable result of the school district's policies or training before the transfer. The majority opinion concludes otherwise. I respectfully dissent because I fear that the role of the aquatic district as a third party, who is the direct cause of injury, is unappreciated, and because plaintiff's novel theory of predecessor liability is a ready means by which to disregard corporate form, which will be troublesome for private businesses and public entities.

## I.  FACTS

Plaintiff does not allege that the school district's successor, the aquatic district, provided inadequate staffing of the pool on the day of the incident. Nor does plaintiff allege that there were too many children in the pool. On the day of the incident, the pool had a larger ratio of lifeguards to pool patrons than was required. The aquatic director reported, "[W]e had two guards [on duty at the poolside] for 20 kids. And the state requirement is one to 40 ratio, and we're at two to 20 * * *." *See* OAR 333-060-0207 ("One lifeguard for

every 40 patrons in the pool, or fraction thereof, shall be provided."). In addition, the Taekwondo Association, which sponsored the event, had helpers in the water.

Plaintiff, the child's mother and guardian *ad litem*, saw the scene. Later, she was asked and she answered:

"Q.  When you were there and you saw the number of lifeguards on duty and as well as the other people that were present, did you have any concern about the number of eyes that were there to watch the children?

"A.  No. I was actually comforted by the number of eyes."

To be certain that they had enough lifeguards, the lifeguards had a practice of counting the number of patrons in the pool "[e]very time" and exchanging that information at shift change. To "maintain vigilance," state regulation requires that lifeguards change duty stations at least every hour. OAR 333-060-0208. The aquatic district rotated lifeguards every fifteen minutes.

In the applicable version of the complaint, plaintiff made no allegation against the school district, nor even against the aquatic district, that any lifeguard was inattentive or incompetent.[1] Plaintiff does not allege that any particular guards at the time of the incident were on break, socializing, called away on emergency, distracted by other tasks, or otherwise inattentive.

Plaintiff's daughter was not a swimmer. At the time, she was about four feet tall. The shallow part of the pool is about three feet deep. When her father later stopped at the pool, he gave her a floating foam noodle. The record provides no explanation about the circumstances preceding the moment when she was found unmoving in the shallow part of the pool.

---

[1] The final version of the complaint did allege that the Taekwondo Association failed to supervise, surveil, and watch over plaintiff's child. The earlier versions of the complaint had alleged that the aquatic district was negligent for a failure to maintain a proper look-out and the school district was negligent for failure to have trained staff to maintain a proper look-out. As to the districts, however, the look-out allegations were dropped in the governing version of the complaint.

The aquatic director was later asked at deposition about his investigation of the incident and the reporting required to be made to the state. State regulation provides:

> "If there is a fatality or an injury, requiring medical follow-up either by a personal doctor or an emergency room, it must be reported by the pool operator to the Division within 72 hours of the incident. The operator should use the form provided by the Division."

OAR 333-060-0210(8) (Pool Safety - Incident Reporting). In light of that requirement, the director was asked and answered:

> "Q. All right. So were you the one who conducted the investigation into what happened and filled out the form?
>
> "A. Yes.
>
> "Q. And did you send it in to the Department of Human Services?
>
> "A. Eventually.
>
> "Q. Was it something where maybe it hadn't been something that had happened in a while so—
>
> "A. *It's never happened.*"

(Emphasis added.) In saying that such an incident had never happened before, the witness's frame of reference was not limited or brief. He was the same aquatic director who served the aquatic district and who had previously served the school district in the same capacity.

The transfer of the pool operations from the school district to the aquatic district had occurred by means of a "Pool Facilities Lease and Operations Intergovernmental Agreement" ("lease" or "intergovernmental agreement"). Its import was to provide that the aquatic district would be responsible for swimming activities and programs. The school district was no longer in the pool business. If the aquatic district had not been created, the school district had intended to close the pool facility permanently.

The lease provided that, as of July 1, 2010, the aquatic district was responsible for operating and maintaining the pool and the pool's employees. The responsibilities of

the successor district included hiring and managing personnel to staff the pool, meeting facility inspection requirements, ensuring that lifeguards and other supervisory employees have required certifications, and employing a pool manager to supervise pool operations. The lease required the aquatic district to offer employment to any former pool employees of the school district. The pool's aquatic director and the four employees who were on duty at the time of the incident had been previously employed by the school district.

As part of conveying the pool operations to a new operator, the lease also provided that the aquatic district

"shall establish rules and regulations, including safety and sanitary standards, for use of the Facility, consistent with state regulations. These rules and regulations shall be followed at all times by persons using the Facility, including [school district] employees and participants."

Plaintiff conceded that nothing in the lease required the aquatic district to adopt the school district's former policies or pool rules.

The aquatic director declared that, to the best of his memory, neither he nor anyone from the school district recommended that the aquatic district follow the rules or regulations of the school district. He reported that the school district gave no input about policies to the aquatic district. The president of the board of the aquatic district declared that no one from the school district advised, recommended, or pressured the aquatic district to adopt the rules and procedures that had been used by the school district. When the new district adopted its rules "no official or employee of the Tigard-Tualatin School District was present during the meeting." The aquatic district adopted its set of safety policies on August 11, 2010, 41 days after the lease became effective and nine days before this incident.

The past and present policies, adopted first by the school district and later by the aquatic district, took the form of a 1985 handbook, comprised of several varied sorts of documents. The handbook's introduction required each staff member to become familiar with the handbook's job descriptions, pool rules, accident procedures, and other documents.

The job description of a lifeguard required a lifeguard to be qualified with advanced lifesaving courses. A Red Cross First Aid Certificate and a Water Safety Instructor Certificate were preferred. The assigned duties included but were not limited to the following:

"1. Lifeguard from assigned lifeguard station.

"2. Patrol swimming area and deck area.

"3. Rescue of victims in distress.

"4. Enforce pool rules and regulations."

The handbook described the expectations for a lifeguard on a page entitled "Actions of a Good Lifeguard." The first expectation was "Constant Vigilance." (Underscoring in original.) The handbook elaborated:

"Master technique of sweeping your eyes constantly over the surface of the water. (MAKE THIS A HABIT.) Accidents can happen to swimmers of all ages, *in all depths of water*, and to both sexes.

"A second technique that must be mastered is 'selective listening'. Learn to distinguish between shouts of joy and shouts for help."

(Capitalization in original; emphasis added.) The next expectation was a "Rapid Response When an Accident Occurs." (Underscoring in original.)

The handbook's "Pool Rules" required that "[b]efore using the deep end of the pool, the public must exhibit the ability to pass a twenty-five (25) yard swimming test." The rules for pool staff included the following instructions:

"4. Be ready to render assistance to a call of distress, alert to and correct dangerous acts, and be in good condition to carry out their responsibilities.

"* * * * *

"7. When on duty, lifeguard is to be actively supervising the pool. NOT VISITING.

"* * * * *

"9. Be prompt in reporting to their duty stations and not leave their post when the pool is in use.

"* * * * *

"13.  Make sure there is at least one active guard in the chair <u>at all times</u> (or stool-lap swim).

"a.  When the number of swimmers necessitates more than one guard, an adequate number of guards will be stationed in chairs or on the deck to provide supervision of the entire pool area. (Rule of thumb: 25 people - 1 guard, 50 people - 2 guards, 100 people - 3 guards.)

"b.  The number of guards, rotation schedule and guard placement will be determined by the person in charge.

"* * * * *

"21.  A group of swimmers must never be permitted to get between the lifeguard and the swimming area.

"* * * * *

"35.  You have the right to ask anyone to pass a deep water test before allowing him into the mid-section or diving areas of the pool. * * *

"* * * * *

"38.  Guards must keep their eyes on the pool at all times and visiting must be kept at a minimum."

(Underlining and capitalization in original.)

Among the school district's "Accident Procedures" is an "emergency action plan flow chart" outlining proper protocol. The accident procedures include narrative advice on pool patron surveillance involving lifeguards' zone coverage. In particular, two poignant provisions addressed a lifeguard's need for "recognition" and avoidance of "distraction." The document advised:

"**Recognition**

"Knowing how to recognize that a swimmer is in distress or a person is drowning is one of the most important lifeguarding skills. Lifeguards must be able to distinguish such behavior from that of others who are swimming or playing safely in the water. *Lifeguards must recognize when someone needs to be rescued. A lifeguard cannot expect the victim or others to call for help in an emergency.*

> *"Even when a victim slips underwater without a struggle, with good surveillance and scanning techniques, a lifeguard can recognize someone lying motionless within seconds in clear water.*
>
> "*\* \* \* \* \**
>
> **"Distraction**
>
> "Distractions also will affect patron surveillance, for example a lifeguard talking with other lifeguards or friends. A brief conversation might seem innocent, but during that time a 20- to 60-second struggle of a young child could be missed. The child could die because a lifeguard was distracted! Social conversations should not be held while on duty."

(Emphasis added, boldface in original.) There is no dispute of fact between the parties that the lease and the pool policies contained those terms. The lease and policies are background for foreseeability, the material of the parties' arguments, and clues with which the law finds an answer.

## II. PLAINTIFF'S CLAIM

Initially, plaintiff brought a negligence suit against the Taekwondo Association and the aquatic district, alleging that they failed to keep "a proper look-out" over plaintiff's child in the pool or failed to train staff to do so.[2] After the school district was added as a defendant, the operative version of the complaint alleged the same, eight, identical specifications of fault against the aquatic district and school district.[3] These are the specific allegations, recapped later herein, which range from an alleged failure to require lifeguards to use the elevated lifeguard chair to failure to forbid breath-holding contests. "Plaintiff's allegations," she explained later to the trial court, "are about the *transfer* of unsafe policies and procedures to an inexperienced Aquatic District. Only one of eight specifications of negligence (12.c.)

---

[2] The Taekwondo Association and aquatic district resolved their differences with plaintiff in an apparent settlement. They are not parties to this appeal.

[3] As to the aquatic district, plaintiff added that it was also negligent in failing to review existing procedures and train staff on updates before taking over the pool.

mentions training at all."[4] (Emphasis added.) Plaintiff's claim is largely about policies or, more precisely, the absence of policies due to the alleged "failures" to have policies in the eight alleged ways.

In the next paragraph, plaintiff's complaint added that it "was reasonably foreseeable that [the school district's] actions * * * would create an unreasonable risk of harm to pool patrons like [plaintiff's child] after the transfer of operation of the pool to [the aquatic district] because such deficiencies may not be identified and remedied in time to avoid the injury which occurred in this case." Plaintiff assumes that the school district should foresee that its own policies or training created an unreasonable risk, that the aquatic district would not reasonably forsee the same risk, and that the school district should foresee that its successor would perpetuate that risk.

On summary judgment, the school district rejoined that "this court can and should decide as a matter of law that the injury that occurred in August 2010 was not a 'reasonably foreseeable' consequence of the School District's alleged negligence." The injury occurred "at a swimming center it no longer operated." In effect, "the current employer was a superseding cause." The school district came closer to the key to foreseeability when citing *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993), for its rejection of a defendant's liability for "mere facilitation" of the "intervening, harm-producing action" of a third party.

The trial judge was correct when she wrote, "While both sides have some strong arguments, the question is not so simple as either makes it." No claim was made against the school district as lessor or land owner, so it had no special duty to plaintiff's child. The aquatic district, not the school district, had a duty to make the premises reasonably safe for her. But the issue was not as simple as saying that the school district had no vicarious liability for former employees or saying that the successor was an "intervening cause." At least as framed by the pleadings, the issue was

---

[4] Allegation 12(c) asserted a failure "to create, establish and train staff on an emergency action plan to follow when a group uses the pool."

foreseeability, and the trial court concluded that there was none. While the school district operated the pool, the court concluded, the school district could not have reasonably foreseen, at the time of its prior operation through the time of transfer, that its policies and training would be adopted and perpetuated by a successor operator, so as to become a hazard posing an unreasonable risk of injury later when the school district was no longer operating the pool.

## III.  LAW

A.  *Imagined Transfer Liability*

The parties renewed their arguments on appeal. It is easier to see why the plaintiff is wrong than to review case law and learn why the defendant and trial judge were right. Unlike plaintiff, defendant and the trial court recognized, albeit imperfectly, that the involvement of a successor operator—a third-party—changed the foreseeability analysis and refocused the demands of foreseeability.

In plaintiff's view, the school district's fault lies in the "failure," during its prior pool operations, to have adopted policies or a practice without which the pool would not be reasonably safe when a successor operated the pool with its own policies and practices. Plaintiff proposes an analogy. She characterizes the alleged absence of policies or practice as defects in the school district's handbook akin to defects in a truck, transferred to an unsuspecting, new owner and later causing injury to another. Plaintiff relies on *Bailey v. Lewis Farm, Inc.*, 343 Or 276, 171 P3d 336 (2007), to support her argument that a reasonable juror could find that the omissions in its policies created a foreseeable risk of harm that would continue when the pool is operated by a successor. This was and is plaintiff's principal authority and argument before the trial court and on appeal.[5]

In *Bailey*, the plaintiff was injured when a "tractor-trailer's wheels came off, bounced across the road, and hit plaintiff's vehicle in the oncoming lane of traffic[.]" *Id.* at 278. The plaintiff alleged that the defendant had negligently failed to maintain the tractor-trailer, sold it with a

---

[5] The majority opinion does not address nor endorse plaintiff's truck analogy or reliance on *Bailey*.

faulty axle, and caused injuries to the plaintiff. *Id.* at 279. The court rejected the defendant's theory that, as a matter of law, the defendant's lack of ownership at the time of the accident sufficed to avoid liability. *Id.* at 286. The court concluded that "a reasonable jury could find that the failure of the axle, the loss of the wheels, and the resulting injury to plaintiff were all foreseeable." *Id.* at 287.

Plaintiff's analogy to *Bailey* is inappropriate. That case involved an allegation that a truck—a complex piece of equipment—had a hidden defect. The prior owner allegedly created the risk of harm through faulty maintenance and then transferred the truck to a subsequent owner. This case does not involve a truck or another complex piece of equipment. The school district did not create a risk of harm through faulty maintenance of any equipment.[6] Although the school district transferred possession of a physical facility, no fault lies with the pool.

Plaintiff's claim is based on intangibles that were not transferred. The school district did not "transfer" its written policies or unwritten practices. It certainly did not "transfer" any absences, lapses, or oversights in policies or practices to the current pool operator.[7] The lease did not require the aquatic district to use or copy policies from the school district. Instead, the lease required the aquatic district to adopt its own policies, and the aquatic district did so. This distinction from *Bailey* is profound because plaintiff's complaint concerns "failures" to adopt additional policies. Plaintiff's claim concerns policies or practices that are alleged to be missing. The school district did not transfer to the aquatic district any omissions, oversights, or gaps between policies. Unlike *Bailey*, there was no conveyance of a faulty thing. There was no conveyance of a tangible thing, written policies, or especially any intangible omissions of policies or practices. There was no conveyance of any thing

---

[6] The dispute at trial about the state of the elevated chair is not at issue on appeal.

[7] Plaintiff wrote in opposition to summary judgment, "The *gravamen* of plaintiff's allegations against the School District is that the district transferred an unsafe pool operation, *defined by inadequate policies and procedures,* to a fledgling Aquatic District that had no prior experience running a public swimming pool." (Emphases added.)

or non-thing. When plaintiff theorizes that the school district "transferred" an intangible absence of additional policies or practices, the factual basis for plaintiff's claim is more imaginary than real. Plaintiff's theory has no support in *Bailey,* and it has no precedent in Oregon law.

## B. *Injury By Third Party*

The school district was closer to the mark when arguing that the risk of injury was not reasonably foreseeable because the school district no longer operated the pool or employed the staff on duty when the injury occurred. The school district was inartful when characterizing the role of the successor aquatic district as a "superseding cause," and the *Restatement (Second) of Torts* section 452 (1965), which defendant cited, might be inapt.[8] But the *Restatement* provision speaks to "the failure of a *third person,*" in this case the aquatic district, "to act to prevent harm to another," such as plaintiff. (Emphasis added.) And, defendant cited and argued *Buchler,* the leading case on a defendant's liability involving the foreseeability of injury in which the defendant's acts play a role but the third party is the direct cause of injury.

The trial court was on the mark when rejecting the absolutist conclusion about a successor employer as a "superseding cause," when declaring the issue to be general foreseeability, and when recognizing that foreseeability must include consideration of what the school district should have reasonably foreseen, at the time of its own operations, about any risk after the transfer of the pool to a successor operator. The trial court's conclusion that, on this record, this injury was not reasonably foreseeable was correct for reasons well-established in cases involving injury by third parties and is well-founded in this record on what the school

---

[8] *Restatement (Second) of Torts* section 452 advises that:

"(1) Except as stated in Subsection (2), the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm.

"(2) Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause."

district could have foreseen from its own policies, practices, and experience.

The distinguishing features of this case, admitted by plaintiff, are that this injury occurred after the aquatic district took over the pool operations and that the school district lacked any control over the aquatic district's operations. The direct cause of injury, if any, was the action or inaction of the successor pool operator. When the school district is held to account, its liability turns on the foreesability of injury caused by a third party, the aquatic district. Therefore, the better analogy is not to the foreseeability of injury from transfer of a faulty truck (*i.e.*, the *Bailey* analogy) but to the foreseeability of injury, to which the defendant contributes, and which is directly caused by a third party. The better analogy draws on cases involving intentional injury by third parties, and, although the aquatic district's conduct was alleged merely to be negligent, the analogy is useful, because the school district had no control over pool operations of a successor district, the injury was directly caused by the independent action or inaction of the successor, and, at worst, the school district, like other defendants in third-party cases, is alleged to have negligently contributed to the harm. The better analogy tells us something about the foreseeability required to make a predecessor defendant liable for a successor's wrong.

When a third person inflicts the injury, the liability of a defendant turns upon the reasonable foreseeability of the risk of a particular, dangerous person or the risk of a location made unsafe by the conduct of other unknown persons. Foreseeability can be summed up in one question: Did the defendant, who is to be faulted for the act of another person, actually know or have reason to know of the specific danger to plaintiff posed by this third person or by an unknown person at this location? Two lines of cases illustrate the question, showing what foreseeability means when third parties are involved.

The school district cited the principal case involving a defendant's liability for the conduct of a specific, unsafe person. In *Buchler*, the Supreme Court considered the state's liability for one person's death and injury to another when

a prisoner escaped from custody, found keys in a state van, stole a gun from his mother's home, and shot two people two days later 50 miles away. 316 Or at 502. The court considered the specifications of fault involving leaving the keys in the van and the failure to warn plaintiffs in terms of general foreseeability. *Id.* It did so with reference to general foreseeability, as explained in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987), but the court rejected the possibility that liability would follow from simply "facilitating" the harmful act, as previously allowed in *Kimbler v. Stillwell*, 303 Or 23, 734 P2d 1344 (1987). *Buchler*, 316 Or at 509-10. The court considered leaving the keys in the van incidental, like failing to lock the gun case in *Kimbler*. The court concluded that the "generalized foreseeability principle" did not impose liability.[9] *Id.* at 513-14.

In a line of cases after *Buchler*, a defendant's liability for the conduct of a third person may be found within the concept of "general foreseeability." Such liability, however, requires an essential allegation and some supporting evidence that the defendant knew or had reason to know that the third person's conduct presented the risk of harm of the type that befell the plaintiff. *See, e.g., Sande v. City of Portland*, 185 Or App 262, 272, 59 P3d 595 (2002) (defendant knew pattern of robber's attacks in neighborhood); *McAlpine v. Multnomah County*, 166 Or App 472, 483, 999 P2d 522 (2000) (defendant knew the parolee's violent history); *Brown v. Washington County*, 163 Or App 362, 372, 987 P2d 1254 (1999) (defendant knew its inmate had a violent history, was agitated, and was likely to go to the address where the plaintiff was injured); *see also Panpat v. Owens-Brockway Glass Container*, 188 Or App 384, 394-95, 71 P3d 553 (2003) (evidence showed that the employer knew that it had an employee with an intermittent explosive disorder, that he was not authorized to return to work without

---

[9] In *Buchler*, the court noted, as to the defendant's failure to warn, that the plaintiffs had not shown why the state should have known the prisoner would be near the plaintiffs, would have known where the prisoner's mother lived, and would have known he would have stolen a gun. The court concluded that the state had "no duty to warn in the absence of that knowledge" of the specific danger presented to the plaintiffs by the prisoner. 316 Or at 516. Plaintiff, in this case, has not alleged that the school district negligently failed to warn of alleged omissions in its policies or practices.

a mental health evaluation, and that the employee had twice engaged in verbal confrontations with the victim).

This sort of liability, involving the foreseeability of injury inflicted by third parties, is not limited to intentionally caused injury. Even then, when third-party negligence is the cause, the plaintiff still must show the defendant's reason to know about the unsafe tendencies of the third party. *See Faverty v. McDonald's Restaurants of Oregon, Inc.*, 133 Or App 514, 525-26, 892 P2d 703 (1995) (the employer "knew or had reason to know of the number of hours [the employee] had been working").

In third-party cases, "a plaintiff must allege facts demonstrating that the harm by third-party criminal conduct was foreseeable *to the defendant in a concrete way.*" *Piazza v. Kellim*, 271 Or App 490, 504, 354 P3d 698 (2015) (emphasis added). A plaintiff must allege "why either defendant knew or should have known that they needed to protect against [the] hazard" of a third person's misconduct. *Whelan v. Albertson's, Inc.*, 129 Or App 501, 507, 879 P2d 888 (1994) (affirming dismissal of claim against the employer "because [the plaintiff] did not plead that Albertson's knew or should have known of the managers' malfeasance" in harassing a security guard). *See also Stewart v. Kids Incorporated of Dallas, OR*, 245 Or App 267, 286, 261 P3d 1272 (2011), *rev dismissed*, 353 Or 104 (2012) (dismissal for lack of allegation why the defendant knew or should have known of risk of sexual assault at restaurant).

Cases about a dangerous third person parallel the cases about a location made unsafe by unknown persons. In both situations, there is a similar requisite in common: In location cases, liability can arise when the defendant knew or had reason to know from specific evidence that the location presented a risk of criminal harm or violence from unknown, third persons. *Compare Uihlein v. Albertson's, Inc.*, 282 Or 631, 640-41, 580 P2d 1014 (1978) (no liability for shopper assaulted in supermarket when little evidence of unsafe location), *with Brown v. J. C. Penney Co.*, 297 Or 695, 710, 688 P2d 811 (1984) (liability for shopper attacked in parking lot where there was ample evidence of criminal activity in the area); *see also Piazza*, 271 Or App at 490 (defendant allegedly

had reason to know from crime in the neighborhood of risk of shooting patron in line); *Stewart*, 245 Or App at 267 (defendant had no reason to know of risk of sexual assault at teen carwash); *McPherson v. Oregon Dept. of Corrections*, 210 Or App 602, 605-06, 152 P3d 918 (2007) (defendant had reason to know of risk of assault of son and sexual assault of mother in apartment laundry building when the defendant knew neighborhood was unsafe, neighborhood had 86 emergency calls to police in nine years, and apartment managers had called police about problems, including vandalism and trespass in the laundry); *Sande*, 185 Or App at 274 (given repeated assaults and robberies of lone victims by a "mountain-bike" assailant, city had reason to foresee harm to plaintiff from its instruction to neighbor not to warn plaintiff).

The lesson that third-party cases teach is that this plaintiff cannot just allege in a general way that it "was foreseeable that the school district's actions * * * would create an unreasonable risk of harm * * * because such deficiencies [the eight policy or practice omissions] may not be identified and remedied in time to avoid the injury in this case." It is not enough to argue simply that a successor district might choose to adopt its predecessor's policies or was required to offer jobs to its employees. To hold a defendant liable for the actions of a third party, plaintiff must allege and offer some proof that the school district knew or had reason to know that the successor district would fail to adopt a needed policy or practice without which the pool would not be safe. Plaintiff must have alleged and offered some proof that the school district knew or had reason to know that its own past policies and practices were unsafe, knew or had reason to know during its past operations that its past policies and practices would be perpetuated by a successor, and knew or should have known that, if past policies and practices were not changed before the transfer, the aquatic district's operation would pose an unreasonable risk to patrons.[10] *See Buchler*, 316 Or at 514-16; *Whelan*, 129 Or App at 507.

---

[10] As noted above, plaintiff did not allege the school district's fault for a failure to warn the aquatic district about any missing policies. *See Fuhrer v. Gearhart By the Sea, Inc.*, 306 Or 434, 441-42, 760 P2d 874 (1988) (where a plaintiff had alleged an oceanside hotel was liable for failure to warn of riptides or ocean surf but failed to allege that the defendants knew or should have known of the dangerous condition of the surf).

The plaintiff must "demonstrat[e] that the harm" purportedly permitted by the school district "was forseeable *to the defendant in a concrete way*" and not in some "abstract" way. *See Piazza*, 271 Or App at 504 (emphasis added). Plaintiff must have alleged "why * * * defendant knew or should have known that they needed to protect against this hazard." *Stewart*, 245 Or at 286.[11]

## IV. ANALYSIS

The question before the trial court and this court is a matter of foreseeability, given the involvement of a third party and given the undisputed evidence in this record. Plaintiff offered the past and present policies of the school district and aquatic district, and both parties offered witness statements. There was no dispute of fact about those policies, regulations, or the described practices. All this record was before the trial court. We must necessarily assume that those uncontested facts were in the contemplation of the court when it concluded that the risk of plaintiff's injury, after the transfer, was not reasonably foreseeable to the school district beforehand, in light of what the school district knew or should have known.

As the majority notes, the school district argued its position as a matter of law, 273 Or App at 680-81, but the school district did *not* concede that its past policies were unsafe or its practices were negligent. To assume the district's policies and practices were unsafe, and then posit foreseeability on the assumption of negligently omitted policies, is not an approach with which this court should proceed or that this record would support.

In order to test foreseeability, however, the court should ask whether the policies and practices in this record would support a reasonable inference that, because the

---

[11] Plaintiff argued that the school district should have foreseen that an "inexperienced" successor would perpetuate prior policies or practices. The description of the successor district as "inexperienced," however, is more rhetoric than reasonable inference. To be sure, the aquatic district, as a legal entity, was a new creation. There was, however, no evidence about who its board members were or about their experience in management or aquatics. Contrary to any inference of inexperience, the aquatic district hired the pool staff of the school district, including its long-serving aquatic director.

school district knew its own policies and practices, it knew or should have known its policies and practices were unsafe and, when replicated by a successor operator, would present an unreasonable risk. Because the uncontested record was before the trial court when it reached its conclusion, a careful analysis should require that this court likewise consider the record's impact on foreseeability. What the record will show diminishes "in a concrete way" the foreseeability of harm involving the failures that plaintiff alleges. A comparison of plaintiff's eight specifications of fault with the lease, policies, and practices shows why the school district could not reasonably have foreseen this risk.[12]

First, plaintiff alleged a policy omission "[i]n failing to require lifeguards to use the pool's elevated lifeguard chairs for patron surveillance[,]" but the existing pool rules did require the staff to "make sure there is at least one active guard in the chair at all times (or stool-lap swim)."[13]

Second, plaintiff alleged a failure to set procedures "on what to do when a youthful patron cannot be seen or is missing." The pool rules, however, contemplate that a swimmer in the pool should never be out of sight of one of the lifeguards. That is why the rules declare that a group of swimmers—that is, standing—"must never be permitted to get between the lifeguard and the swimming area." And that is why the rules provide that "[g]uards must keep their eyes on the pool at all times." Lifeguards are encouraged to provide "constant vigilance," by creating a habit of "sweeping your eyes constantly over the surface of the water" and remembering that "[a]ccidents can happen * * * in all depths of water."[14]

---

[12] Contrary to the majority's impression, this review is not an exercise in determining a dispute of fact about whether the district committed the alleged negligent breaches. Rather, this review considers, for purposes of foreseeability, what the school district had reason to know about the existence or absence of written policies or established practices.

[13] The record does not indicate that there was more than one elevated chair. As to it, the testimony was that the lifeguards used deck-side stools and "almost never" used the elevated chair. That is immaterial to this appeal. Plaintiff's complaint against the school district involves the school district's adopted policies, not where the aquatic district's lifeguards actually sat at the time of the incident.

[14] "What to do" when something is amiss is addressed with regard to the fourth specification of fault.

Third, plaintiff alleged a policy failure "[i]n failing to create, establish and train staff on an emergency action plan to follow when a group uses the pool[,]" but the Accident Procedures provide an action plan for any pool emergency, and the handbook requires all pool employees to be familiar with it.

Fourth, plaintiff alleged a failure "to require immediate lifeguard intervention when a patron is submerged and motionless in the pool for more than 30 seconds[,]" but, in fact, several policies addressed the situation. The lifeguard's job description, a part of the policy handbook, required "[r]escue of victims in distress." The duties of a lifeguard required "rapid response when an accident occurs." Specifically, a document on lifeguarding advised that "[l]ifeguards must recognize when someone needs to be rescued." The document added that, with good surveillance and scanning techniques, "a lifeguard can recognize someone lying motionless within seconds in clear water." In other words, pool policies did require immediate rescue.

Fifth, plaintiff alleged a failure to create a procedure to use a sign-in sheet to provide a count "so lifeguards would know how many patrons were using the pool." In fact, however, one of the lifeguards on the scene testified that, as a matter of practice, the lifeguards count the number of patrons in the pool "[e]very time."

Sixth, plaintiff alleged a failure to create a policy to require lifeguards to conduct swim tests and to enforce rules on where nonswimmers are allowed to go. In fact, however, the pool rules do require that, "[b]efore using the deep end of the pool, the public must exhibit the ability to pass a twenty-five (25) yard swimming test." The policies also remind lifeguards: "You have the right to ask anyone to pass a deep water test before allowing him into the midsection of diving areas of the pool." Rules did exist to keep a nonswimmer from deep water.

Seventh, plaintiff alleged a failure to have a policy "to maintain current lifeguard certification for the facility's aquatic director." State regulation required that a public pool have a certified pool operator. OAR 333-060-0207(1). The school district did better than have a policy on point. In its

intergovernmental agreement, the school district expressly required the aquatic district to maintain certification.

Eighth, plaintiff alleged a failure to have a policy to prohibit pool users "from engaging in breath holding contests." Assuming, as does plaintiff, that holding one's breath at length under water is dangerous, the pool rules did require, on the prevention side, that lifeguards be "alert to and correct dangerous acts." On the rescue side, the pool rules required, "Guards must keep their eyes on the pool at all times * * *." And, as noted before, the lifeguarding instructions posited that, with good surveillance and scanning, a lifeguard should "recognize someone lying motionless within seconds in clear water."

Taken together, the record reveals that the school district's knowledge of its existing practices, pool policies, and the lease requirements would not have provided the school district knowledge or a reason to know of an unreasonable risk of harm, due to any alleged oversights or omissions, either while the school district operated the pool or when the pool would be transferred to a successor district.

Foreseeability is further affected by the duty that the aquatic district had to adopt its own policies and the freedom to do so as it wishes, subject to state safety standards. The aquatic district was required by lease to adopt a set of policies, and it did. There was no evidence that the school district knew or had reason to know, at the time it operated the pool, that a successor district would reproduce a policy omission, even if there were any. The agreed evidence is that the aquatic district was under no compulsion to mimic or to continue the policies of the school district. Witnesses attested that no one from the school district encouraged the aquatic district to use the school district's past policies. Just as the past policies were not "transferred" to the aquatic district, the policy *omissions* of the school district were not transferred to the aquatic district. The school district could not know, nor have had reason to know, what the aquatic district would fail to do in adopting policies or practices.

Given the law of liability for a third party's act or omission, the only remaining argument for foreseeability might arise if, given all the circumstances, the school district

knew or should have known that poor training and a bad record of mishaps made the pool an unsafe location and the school district had failed to warn. But plaintiff did not allege a failure to warn. Plaintiff only alleged, in effect, that the school district's practices and policies made a bad model, which the school district should have expected to be copied. The school district, however, did not know or have reason to know that it was a bad model; it did not have a bad record of mishaps. The evidence on point is uncontested, and it refutes that sort of foreseeability. The aquatic director who had served since 1985 testified that, as for accidents like this, it had "never happened" before. In the absence of evidence that similar injuries were known to the school district under its operation, the school district cannot be faulted for the successor's alleged failure to enact additional policies or practices.

## V.  CONCLUSION

Plaintiff's theory may prove to be a troublesome precedent. I fear that this theory of transfer liability, based on a vague argument about foreseeability, portends the ready disregard for corporate form. It could haunt public entities like these, even after one organization ceases service and a later organization causes harm. It could haunt private entities when one business closes under an asset purchase agreement and a separate business later causes injury. If merely being a "bad" model (even one without injuries) suffices to make a predecessor entity liable for a successor's wrong, then unwarranted mischief may trouble both private and public entities hereafter.

The injury to plaintiff's child is tragic, but recourse against more plausible defendants has already been available. As against this defendant—the school district that had gone out of the pool business—plaintiff's allegations and evidence fell short. Plaintiff failed to show that the prior operator of the pool had knowledge or reason to know the dangers that could render it liable for the allegedly incomplete practices or policies of the successor operator. I believe that the trial court did not err in granting defendant's motion for summary judgment. For those reasons, I respectfully dissent.